**Danny B. STILLMAN, Plaintiff,**

v.

**DEPARTMENT OF DEFENSE, et al.   Defendants.**

**No. CIV. 01–1342(EGS).**

United States District Court, District of Columbia.

June 10, 2002.

---

Mark Steven Zaid, Esq., Lobel, Novins & Lamont, Washington, D.C., for Danny B. Stillman.

James D. Todd, U.S. Dept. of Justice, Civil Division, Washington, D.C., Karen Kathleen Richardson, Esq., U.S. Department of Justice, Washington, D.C., Vincent Morgan Garvey, U.S. Dept. of Justice, Civil Division, Washington, D.C., Gail Walker, U.S. Dept. of Justice, Civil Division, Washington, D.C., for Dept. of Energy.

James D. Todd, U.S. Dept. of Justice, Civil Division, Washington, D.C., Karen Kathleen Richardson, Esq., U.S. Department of Justice, Washington, D.C., Richard G. Phillips, Jr., U.S. Dept. of Justice, Washington, D.C., Vincent Morgan Garvey, U.S. Dept. of Justice, Civil Division, Washington, D.C., Gail Walker, U.S. Dept. of Justice, Civil Division, Washington, D.C., for Dept. of Defense, Defense Intelligence Agency.

James D. Todd, U.S. Dept. of Justice, Civil Division, Washington, D.C., Karen Kathleen Richardson, Esq., U.S. Department of Justice, Washington, D.C., Richard G. Phillips, Jr., U.S. Dept. of Justice, Washington, D.C., Gail Walker, U.S. Dept. of Justice, Civil Division, Washington, D.C., for C.I.A.

Arthur Barry Spitzer, Esq., American Civil Liberties Union, Washington, D.C., Mark H. Lynch, Esq., Covington & Burling, Washington, D.C., for American Civil Liberties Union of the National Capital Area.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiff Danny Stillman is a former employee of the Los Alamos National Laboratory who has written a book on China's nuclear weapons program. Plaintiff filed this lawsuit against the United States Department of Energy ("DOE"), Department of Defense ("DOD") and the Central Intelligence Agency ("CIA") alleging that defendants' classification of portions of plaintiff's manuscript during the mandatory pre-publication clearance process was improper and violated his First Amendment rights. After extended negotiations over the passages at issue, the remaining defendants DOD and CIA maintain that they have properly classified his manuscript. Plaintiff has participated in negotiations with defendants over defendants' classification determinations without the assistance of counsel. Defendants have denied access to plaintiff's counsel to those portions of the manuscript that have been designated by defendants as classified.

The case comes before this Court on plaintiff's motion to compel defendants to permit his counsel access to the classified portion of the manuscript and defendants' classified pleadings in support of those classifications. Plaintiff has alleged that denying his counsel access to this information, and preventing plaintiff from speaking to his counsel about this information, violates his First Amendment rights to a reasonable pre-clearance process and to speak freely with counsel. Plaintiff's arguments are also supported by an *amicus curiae*, the American Civil Liberties Union (ACLU), whose participation the Court invited and to whom the Court is grateful. Defendants respond that their decision to deny plaintiff's counsel access to the information because he does not have a "need to know" is not reviewable by this Court, and even if it were, the compelling national security interests in preventing disclosure of this sensitive information outweigh any First Amendment interest here.

Having considered plaintiff's motion to compel, the responses and replies thereto, the additional rounds of briefing requested by this Court, the briefs of *amicus curiae* American Civil Liberties Union (ACLU), the oral argument of the parties and amicus before this Court on April 26, 2002, as well as the applicable statutory and case law, this Court **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion to compel.

## BACKGROUND

Danny Stillman is a former employee of the Los Alamos National Laboratory ("Los Alamos"), which operates under contract with the DOE for work related to the nuclear weapon stockpile of the United States. After Mr. Stillman's retirement from full-time employment at Los Alamos, he authored a manuscript entitled "Inside China's Nuclear Weapons." That manuscript describes his nine trips to China to visit nuclear weapons facilities and test sites between 1990 and 1999.

As a condition of Mr. Stillman's employment at Los Alamos, he signed a number of non-disclosure agreements that require submission of this manuscript to the government for pre-publication review to determine whether any portion contains classified information. Mr. Stillman complied with those agreements and submitted his manuscript for review. In October of 2000, Mr. Stillman was informed that no portion of his manuscript would be approved for public release. Plaintiff engaged in ongoing negotiations with defendants over the classification determination.

On June 18, 2001, plaintiff filed this lawsuit, alleging that the DOE, DOD, and CIA have violated his First Amendment rights by improperly classifying his manuscript and refusing to authorize its publica-

tion. After the filing of this lawsuit, defendants removed their objections to a substantial portion of the manuscript. The DOE's objections to the publication of certain information were resolved when plaintiff agreed to delete the information at issue. DOE was subsequently dismissed from this suit. *See* Order of 10/16/01. The DOD and CIA continued to withhold authorization to publish portions of Mr. Stillman's manuscript. During the course of this lawsuit, plaintiff and defendants have conducted negotiations over that manuscript, the result of which has been to further narrow the scope of the disagreement. However, substantial disagreement remains.

While Mr. Stillman obviously has access to the portions of the manuscript he wrote to which defendants object, his counsel does not. Plaintiff's counsel, Mark Zaid, has consistently requested authorization for access to the material identified as classified in plaintiff's manuscript since being retained by plaintiff in March of 2001. At a status hearing before this Court on September 5, 2001, government counsel indicated that Mr. Zaid was being denied access to the classified information because he did not have the requisite "need to know," as set forth in Executive Order 12958 ("Classified National Security Information"), 60 Fed.Reg. 19825 (Apr. 17, 1995), 3 C.F.R. 333 (1976), *reprinted at* 50 U.S.C. § 435 (note).

Executive Order 12958 sets forth a uniform system for classifying, safeguarding, and declassifying national security information. 60 Fed.Reg. 19825 (April 17, 1995). Section 4.2 of Executive Order 12958 states that "a person may have access to classified information" provided three conditions are met: 1) "a favorable determination of eligibility for access has been made by an agency head or the agency's head's designee;" 2) "the person has signed an approved nondisclosure agree-

ment;" and 3) "the person has a need-to-know the information." Exec. Order 12958 § 4.2, 60 Fed.Reg. at 19836. "Need-to-know" is defined at § 4.1(c) of the Order, as "a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function." Exec. Order 12958 § 4.1(c), 60 Fed.Reg. at 19836. Executive Order 12958 provides a right and procedures for appeal, but only to "authorized holders of information" who challenge classification status of information as improper. Exec. Order 12958 § 1.9, 60 Fed.Reg. at 19830.

Following the September 5, 2001 hearing, Mr. Zaid submitted letters of appeal to both DOD and the CIA, pursuant to the remedies set forth in Part 5 of Executive Order 12968. Executive Order 12968, entitled "Access to Classified Information," creates a "uniform Federal personnel security program for employees who will be considered for initial or continued access to classified information." 60 Fed.Reg. 40245 (August 2, 1995). Mr. Zaid's appeal was denied by both the CIA and DOD on October 5, 2001. *See* Pl.'s Motion to Compel, Ex. 1–A (letter to Mark Zaid from Robert J. Eatinger, Jr., Associate General Counsel, CIA dated Oct. 5, 2001 and letter to Mark Zaid from Stewart F. Aly, Associate Deputy General Counsel, DOD dated Oct. 5, 2001) ("CIA letter" and "DOD letter").

The CIA letter, signed by Robert J. Eatinger, Jr., Associate General Counsel of the CIA, stated that although Mr. Zaid had no appeal rights pursuant to Executive Order 12968 because he was not a government employee, even if he could appeal, he was denied access to the classified information because the CIA determined he did not have a "need to know" as

defined in Executive Order 12958. *See* CIA letter. The letter stated by way of explanation that "[t]he fact that you represent a client in litigation with the CIA does not, alone, establish a need-to-know. Under Executive Order 12958[sic], this determination is wholly within the discretion of the agency controlling the information, and there is neither a right to, nor an administrative process for, appeal." *Id.*

The DOD letter, signed by Stewart F. Aly, Associate Deputy General Counsel of DOD, also stated that Mr. Zaid did not have any right to appeal under Executive Order 12968, and even if he did, the DOD has determined he lacks the requisite "need to know." *See* DOD letter. The letter explains:

> [T]he Department of Defense has determined that you have not demonstrated a "need-to-know" that information in order to perform or assist in a lawful and authorized governmental function ... The mere fact that you represent a plaintiff in a case involving classified information does not establish a "need-to-know." There is no right to appeal a need-to-know determination. *See* Part 5, Section 5.1 of Executive Order 12968 (a need-to-know "is a discretionary determination and shall be conclusive").

*Id.* Further, DOD's letter stated that while DOD has established policies and procedures by which attorneys representing DOD military, civilian or contractor personnel engaged in lawsuits against the DOD may be provided access to DOD classified information, the fact that Mr. Stillman was never an employee of DOD precluded the applicability of those regulations. *Id.* (citing DOD 5200.2–R, ¶ 3–404(f)).

Because both defendants determined that Mr. Zaid did not have the requisite need to know, neither made a determination as to his background or eligibility for access. *See* DOD letter ("the Department of Defense has not made any determination regarding your eligibility for access to classified information under other circumstances. The decision not to authorize your access to the classified information at issue in this Stillman manuscript is based solely on a determination that you do not have a 'need to know' this information."); CIA letter ("Since, as an initial matter, you were found to have no need-to-know, the Agency has no need to, nor did it, determine your access eligibility in this case."). Thus, defendants' denial of access did not turn on any particular concern with Mr. Zaid.[1]

The declarations from Mr. Eatinger and Mr. Aly filed by defendants further explain their respective decisions that plaintiff's counsel lacked the requisite need to know. *See* Defs.' Supp. Mem. of 3/8/2002, Declaration of Robert J. Eatinger, Jr. ("Eatinger Decl.") and Declaration of Stewart F. Aly ("Aly Decl.").

Mr. Eatinger is the Chief of the Litigation Division within the CIA's Office of General Counsel. Eatinger Decl. at ¶ 1. Among Mr. Eatinger's responsibilities as the Chief of Litigation is "determining whether any non-CIA person, other than Article III, U.S. Constitution judges, may be granted access to CIA classified information in the course of any litigation." *Id.* at ¶ 2. It was his decision to deny plaintiff's

---

**1.** While Mr. Zaid's trustworthiness or lack thereof is not the justification given by defendants for denying Mr. Zaid access, both parties make representations with respect to that issue. Plaintiff points out that he has been given the appropriate security authorization to view classified information when acting as counsel in other lawsuits against defendants. Defendants, on the other hand, point out that Mr. Zaid was involved in a case before Judge Lamberth of this Court that was dismissed because of counsel's disclosure of confidential information in violation of a non-disclosure agreement.

counsel access to the portions of plaintiff's manuscript designated as classified by the CIA. *Id.* at ¶ 7.

As the Chief of Litigation, Mr. Eatinger became familiar with this litigation and has reviewed the classified portions of plaintiff's manuscript. He contends that the pre-publication review of this manuscript was complicated "by the fact that it contains equities of several federal agencies, requiring extensive coordination between these agencies." *Id.* at ¶ 4. It was these "complexities" plus the "sensitive nature of the information at issue" which led Mr. Eatinger to "strictly construe and apply the need-to-know principle." *Id.* Mr. Eatinger then explained that the need-to-know determination was "based on whether providing Mr. Zaid access to the information at issue was necessary to permit him to perform or assist in a lawful and authorized governmental function." Id. at ¶ 9. Mr. Eatinger then explained that:

> CIA determined that providing it was not. The fact that Mr. Zaid represents a client in civil litigation against the CIA or United States Government does not, by itself, qualify as a need-to-know under Executive Order 12958. Mr. Zaid is not performing a lawful and authorized government function, but rather is representing a private party seeking to vindicate through litigation that private party's grievance against the United States. Nor will Mr. Zaid be aiding the United States in performing a lawful and authorized government function.

> *Id.*

Then, without reference to the "lawful and authorized governmental function" standard, Mr. Eatinger distinguished Mr. Zaid's request from other occasions when the CIA has granted access to a plaintiff's counsel involved in litigation against the CIA:

> In the majority of these cases, the mere fact that the counsel's client is a current or former CIA employee is classified and the need-to-know is limited to that classified fact ... Even in these cases, however, the Agency must consider the sensitivity of the classified information at issue.

*Id.* at ¶ 10. Mr. Eatinger also distinguished this case from those prior occasions when the CIA Publication Review Board has granted an attorney access to classified information during the pre-publication administrative review process:

> In those cases, the Agency official empowered to determine a need-to-know is the Chair of the Agency's Publication Review Board. That official has in some cases determined that a private attorney was aiding the United States in performing a lawful and authorized function by negotiating specific language changes during a nonadversarial process of manuscript review.

*Id.* at ¶ 11. Once the author files a lawsuit, however, "the matter moves from an administrative negotiation to an adversarial litigation, and the authority to determine need-to-know becomes mine, subject to review by senior authorities within the Office of General Counsel and CIA." *Id.*

Mr. Aly is an Associate Deputy General Counsel at the DOD. Aly Decl. at ¶ 1. Mr. Aly's responsibilities include acting as counsel to the office that conducts pre-publication reviews and "ensuring that security programs are conducted in compliance with all applicable statutes, Executive Orders, and DOD regulations." *Id.* at ¶¶ 3,4. Mr. Aly made the decision to deny plaintiff's counsel access to the portions of plaintiff's manuscript designated as classified by the DOD because access was not "consistent with [the applicable] orders and regulations and with the interests of national security." *Id.* at ¶ 8.

Mr. Aly considered the applicability of two DOD regulations that discuss the re-

lease of classified information in litigation. *Id.* at ¶¶ 10, 11. The DOD regulation that implements Executive Order 12958 is DOD regulation 5200.1–R. *See id.,* Ex.6. That regulation states that release of classified information in litigation is governed by DOD Directive 5405.2 ("Release of Official Information in Litigation and Testimony by DOD Personnel as Witnesses," dated July 23, 1985). This Directive, in turn, assigns responsibility for acting on requests for release in litigation to the DOD General Counsel's Office and sets forth factors to be considered in deciding whether to authorize the release of information. Those factors include whether the information is classified, except for in camera disclosures subject to assertion of privilege. *See id.,* Ex. 7.

The other DOD regulation that authorizes the release of classified information in litigation is 5200.2–R, ¶ 3–404(f). *See id.,* Ex. 8. That regulation states:

> Attorneys representing DOD military, civilian, or contractor personnel requiring access to DOD classified information to properly represent their clients shall normally be investigated by DIS and cleared in accordance with the prescribed procedures in paragraph C3.4.2. This shall be done upon certification of the General Counsel of the DOD component involved in the litigation that access to specified classified information, on the part of the attorney concerned, is necessary to adequately represent his or her client.

*Id.* Mr. Aly concluded that this regulation does not apply because Mr. Stillman has never been an employee of DOD. *Id.* at ¶ 11.

Mr. Aly has reviewed the classified portions of plaintiff's manuscript and has met on several occasions with classification experts in DOD to discuss the manuscript. *Id.* at ¶ 5. Mr. Aly concluded that the "extremely sensitive nature of the classi-fied information to which Mr. Zaid seeks access" led to a "corresponding need to construe and apply the need-to-know requirement strictly." *Id.* at ¶ 14. With this "in mind," Mr. Aly then determined that Mr. Zaid did not have the requisite "need-to-know" because he was neither performing nor assisting in a government function: "First, Mr. Zaid, in representing Mr. Stillman in this challenge to the classification of specific information, is not performing a governmental function." *Id.* at ¶ 14(a). The letter continued:

> Second, Mr. Zaid does not require access to the classified information at issue in order to 'assist' in a government function. Disclosure of classified information to Mr. Zaid would not assist the Department of Defense or DIA in protecting that information from unauthorized disclosure because he has no experience or expertise in this area. Nor would it assist in evaluating his claims, and those of his client, that the information should not be classified for the same reason and for an additional one: his views as a private citizen are not relevant to the official determination. To the extent Mr. Zaid seeks access to this information in order to assist Mr. Stillman in pursuing his claims against the government, Mr. Stillman is not performing a governmental function in bringing a lawsuit but rather is pursuing personal interests. To the extent Mr. Zaid seeks access to this information in order to assist the Court in its governmental function of ruling on the merits of Mr. Stillman's claims, Mr. Zaid does not require access to the information at issue in order to render such assistance. As an attorney, and officer of the Court, he can perform many important functions, including advising the Court (and his client) about the relevant case law and the legal issues he has identified. To the extent that it becomes appropri-

ate for Mr. Stillman to submit any information that may be classified, Mr. Zaid can also advise him as to the procedures for making such a submission to the Court, and any relevant Local Rules. None of this requires access to the classified information at issue.

*Id.* at ¶ 14(b).

After Mr. Zaid's appeal was denied by the DOD and CIA, plaintiff filed the motion to compel presently before this Court. After receiving the response and reply to that motion, this Court determined that further briefing on the First Amendment issues raised by this case was needed, and therefore issued an Order on December 13, 2002 identifying several issues to be addressed. The Court also ordered defendants to submit for *in camera, ex parte* review "evidence that sets forth the reasoning for the denial of access to plaintiff's counsel on the grounds that he does not have the requisite need to know."[2] Subsequent to issuing this Order, the Court granted the ACLU permission to file an amicus brief discussing these First Amendment Issues. After receiving the parties' and amicus' responses to this Court's Order of December 13, 2001, this Court determined that further briefing was necessary to discuss possible ways in which the Court could resolve this motion. That briefing was completed on March 22, 2002. The Court then determined once again that further briefing was necessary to clarify the government's separation of powers argument. That briefing was completed on April 24, 2001. A hearing was held on April 26, 2002 at which counsel for plaintiff, defendants, and amicus presented oral arguments.

## DISCUSSION

### I. Defendants' Denial of Access to Plaintiff's Counsel is Subject to Judicial Review for Violations of the First Amendment.

The question before the Court is the constitutionality of defendants' decisions to deny plaintiff's counsel, Mr. Zaid, access to the allegedly classified portions of plaintiff's manuscript and the defendants' classified declarations for the purpose of challenging the pre-publication classification decisions in this Court. Defendants argue that the United States Constitution has placed the discretion to control access to classified information solely in the hands of the Executive Branch of the federal government, and therefore this Court is precluded from reviewing plaintiff's First Amendment challenge to defendants' actions here. Contrary to defendants' argument, the Constitution itself provides this Court's authority to review defendants' actions.

### A. Constitutional Interests Implicated Here

■ The interest of the President in controlling access to information bearing on national security derives from Article II of the United States Constitution. *See Department of Navy v. Egan,* 484 U.S. 518, 525, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). The President has the authority to protect such national security information pursuant to both the Executive Power, U.S. Const. Art. II, § 1(1), and as "Commander in Chief of the Army and Navy of the United States," *id.* at § 2(1). As the Supreme Court explained in *Egan,* "[The President's] authority to classify and control access to information bearing on na-

2. In response to this Court's Order of December 13, 2001, and in response to the briefs filed by plaintiff and the ACLU, defendants submitted the two unclassified declarations of

Mr. Eatinger and Mr. Aly discussed above. Defendants also submitted four classified declarations for this Court's *in camera, ex parte* review.

tional security and to determine whether an individual is sufficiently trustworthy ... [to have] access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." 484 U.S. at 527, 108 S.Ct. 818 (*citing Cafeteria Workers v. McElroy*, 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Thus, the federal government's "compelling interest" in controlling access to national security information has been long recognized by the Supreme Court. *See, e.g., Egan*, 484 U.S. at 527, 108 S.Ct. 818 (discussing history of United States' information classification); *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980); *United States v. Robel*, 389 U.S. 258, 267, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Totten v. United States*, 92 U.S. (2 Otto) 105, 106, 23 L.Ed. 605 (1875).

The speech interests asserted by plaintiff here are equally fundamental. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *see also New York Times v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."). The constitutional protection of the freedom of speech "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The First

Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943). This essential freedom applies with special force to speech aimed at government institutions: "(I)t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941). As the Supreme Court emphasized in *New York Times v. Sullivan*, "[w]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270–71, 84 S.Ct. 710 (*citing Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) *and De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937)).

■ Furthermore, the authority of this Court to pass judgment on constitutional questions is also constitutionally grounded, deriving from Article III itself. It is fundamental that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). As the Supreme Court stated when faced by the Executive Branch's claim of the nonjusticiability of executive privilege in *United States v. Nixon*, "[o]ur system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by anoth-

er branch." 418 U.S. 683, 704, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)(*Nixon I*); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C.Cir.1995) ("Of course, under Article III of the Constitution the courts are the final arbiters of the law...").  Thus, any claim by a coordinate branch of government that a court lacks the ability to determine whether an individual's constitutional rights have been infringed must overcome a weighty presumption of reviewability.

## B.  Nature of the Decision Made by Defendants to Deny Plaintiff's Counsel Access

This case presents a conflict among interests of constitutional dimension, and it is emphatically the province and duty of this Court to resolve this conflict.  However, before proceeding to the issue of justiciability, it is important to explain why this constitutional conflict is less clearly presented than the government would have this Court believe. . Defense counsel has consistently characterized the decision to deny plaintiff's counsel access to information as based on an assessment of the risk to national security caused by disclosure of this information.  *See, e.g.*, Defs.' Mem. of 3/12/02 at 7 ("Both decisions turn on predictive judgments as to the risks to national security from allowing access to classified information and thus both must be left to Executive Branch discretion under our constitutional framework.").[3]

Regardless of defense counsel's *arguments* to this Court, the *evidence* submitted by defendants from the two individuals who made the decisions to deny access reflects a slightly different justification for those decisions.  The two letters to Mr.

Zaid from Mr. Eatinger and Mr. Aly, and the Eatinger and Aly Declarations make clear that while the sensitivity of the information at issue led DOD and the CIA to construe the need-to-know standard narrowly, it was the need-to-know standard itself that led them to reject Mr. Zaid's request.  Specifically, both Mr. Eatinger and Mr. Aly explain that they denied access to Mr. Zaid because they determined that Mr. Zaid was not performing or assisting with a governmental function.  A denial of access based on this determination presents a very different question than a denial of access based on the predicted risk to national security caused by release of the information.

To be clear, neither Mr. Eatinger nor Mr. Aly stated that they determined that Mr. Zaid did not have the requisite need-to-know wholly because of the risk to national security posed by release of this information. . Rather, they both stated that although the sensitivity of this information was a consideration that led them to narrowly construe the need-to-know provision, the denial was based on the fact that Mr. Zaid was not performing or aiding in a legitimate governmental function.

This explanation was not made clear in the letters sent to Mr. Zaid. The letters from DOD and the CIA to Mr. Zaid that denied his appeal of the decision to deny access stated simply that Mr. Zaid did not have the requisite need-to-know information in order to "perform or assist in a lawful and authorized governmental function." By way of explanation of the need-to-know decision, Mr. Aly stated only that "[t]he mere fact that you represent a plaintiff in a case involving classified informa-

---

**3.**  Furthermore, in response to this Court's Order to defendants to submit *in camera, ex parte* explanations of the reasons for determining Mr. Zaid lack the requisite "need to know," defendants submitted four classified

declarations that purport to "attest to the potential harm to national security that would result from disclosure of the information at issue in plaintiff's manuscript." Defs.' Mem. of 3/12/02 at 17 n. 20.

tion does not establish a 'need-to-know.'" Mr. Aly never mentioned the sensitivity of the information at issue in this letter as a reason for determining Mr. Zaid lacked a need-to-know. The CIA provided even less information to Mr. Zaid. Mr. Eatinger's letter stated only that the CIA determined that Mr. Zaid lacked the requisite need-to-know, and that "[t]he fact that you represent a client in litigation with the CIA does not alone, establish a need-to-know." The CIA letter mentioned neither the governmental function requirement nor the sensitivity of the information at issue as an explanation for deciding that Mr. Zaid lacked a need-to-know.

The declarations of Mr. Aly and Mr. Eatinger prepared for this litigation further explain their respective decisions and raise the sensitivity of the information at issue for the first time. Mr. Eatinger, on behalf of the CIA, stated that

> The need-to-know determination made by the CIA was based on whether providing Mr. Zaid access to the information at issue was necessary to permit him to perform or assist in a lawful and authorized governmental function. CIA determined that providing it was not... Mr. Zaid is not performing a lawful and authorized government function, but rather is representing a private party seeking to vindicate through litigation that private party's grievance against the United States.

*Id.* at 4–5. Mr. Eatinger also explained that two things led him to "strictly construe and apply the need-to-know principle": the "sensitive nature of the information," as well as the complications caused by the "extensive coordination" required because of the number of different agencies involved in the prepublication review.[4] Similarly, Mr. Aly concluded that the "extremely sensitive nature of the classified information to which Mr. Zaid seeks access" led to a "corresponding need to construe and apply the need-to-know requirement strictly." *Id.* at ¶ 14. With this "in mind," Mr. Aly then determined that Mr. Zaid did not have the requisite "need-to-know" because he was neither performing nor assisting in a government function. Unlike Mr. Eatinger, Mr. Aly then gave a very detailed explanation for why a plaintiff's counsel suing the government is not performing or assisting in a government function.[5] *Id.*

It is not clear to this Court what these officials meant when they said the sensitive nature of the material led them to construe the need-to-know provision narrowly, and therefore decide that Mr. Zaid did not serve a governmental function. Does this mean that they would have interpreted "governmental function" differently had the information been less sensitive?[6] The connection between whether Mr. Zaid serves a governmental function by helping to challenge classifications decisions and

---

4. The Court can not see any connection between the asserted concern with coordination among the various agencies involved and the government's interest in denying Mr. Zaid access to this information.

5. As is discussed below, this Court strongly disagrees with Mr. Aly's personal assessment of the assistance that Mr. Zaid can provide as an attorney to his client in this lawsuit.

6. Perhaps the convoluted nature of the DOD and CIA's explanations of their actions can be explained by the fact that the Executive Order

these officials were purporting to apply does not allow for considerations of risk to security to impact the need-to-know determination. However, regardless of whether the Executive Order was followed, as will be explained below, plaintiff is not suing and cannot sue to enforce the terms of this Executive Order. The lawsuit derives from the Constitution itself. Whether or not the government adhered to its Executive Order is relevant to this First Amendment challenge only insofar as the Court must determine the actual basis for this denial of access in order to balance the interests truly at stake here.

the sensitivity of the information at issue has never been explained by the government. Indeed, despite the explanations given by their own declarants, defendants continue to assert that "the questions of what constitutes a 'lawful and authorized governmental function' and whether plaintiff's counsel 'requires' access to classified information to assist such a function are not properly before the Court." Defs.' Mem. of 3/8/02 at 9 n. 12.

Thus, the government has been less than straightforward as to why it denied Mr. Zaid access to this information. Defense counsel has consistently argued a position that is belied in part by the evidence defendants have submitted to this Court. In light of the serious allegations that DOD and the CIA are intentionally denying plaintiff's counsel access in order to retaliate against plaintiff for asserting his First Amendment rights,[7] such inconsistencies by the government in explaining its decision are, to say the least, suspect.

Furthermore, such inconsistencies create difficulties for this Court's analysis of the constitutional questions presented here. If DOD and the CIA denied Mr. Zaid access based on their assessment of the sensitivity of this information to national security, then the government's interest and expertise in making such determinations are arguably compelling and must be balanced as such. However, if these agencies denied Mr. Zaid access because they determined that Mr. Zaid was not performing a "governmental function" as required by the Executive Order's definition of "need-to-know," then the government's interest and expertise in making that type of determination are neither compelling nor deserve deference by this Court.

At the end of the day, the Court will rely on the explanations given by the officials who actually made these decisions, Mr. Eatinger and Mr. Aly, rather than the *post hoc* explanation of those decisions given by defense counsel. A fair reading of Mr. Eatinger and Mr. Aly's declarations indicates that they denied access because Mr. Zaid failed to perform or assist in a government function, but that decision was at least informed in part by the sensitivity of the information at issue. The Court believes it would be error to fail to recognize the role played by the sensitive nature of the information at issue here. However, it would equally be error to attribute all of their decisions to the security risk justification. Thus, this Court will analyze the constitutional questions with both of these justifications in mind. However, the lack of clarity with which the government has proceeded, and defense counsel's mischaracterization of the decisions that were made, will be given appropriate weight in this Court's First Amendment analysis, particularly with respect to whether the government's action here was aimed at the suppression of free expression, and whether this action was sufficiently tailored to serve a compelling government interest.

## C. The Government's Separation of Powers Argument

With the government's explanation for its actions in mind, this Court turns to the argument that it lacks the authority to hear this constitutional challenge. The government makes several arguments, to

---

7. This allegation finds support in Mr. Eatinger's explanation that attorneys who represent individuals who challenge classification decisions at the administrative level are often granted access to the allegedly classified material, but are not given access once the decision is made to challenge those classifications in federal court. *See* Eatinger Decl. at ¶¶ 10–11. The access is not granted once the process becomes "adversarial." Such an admission strongly suggests that the CIA is denying access in litigation in order to maintain an advantage in that litigation.

be discussed in turn, why this Court can not review the decisions made by DOD and the CIA to deny plaintiff's counsel access to the allegedly classified information at issue. First, the government contends that the Executive's authority to deny access is a power grounded in the text of Article II itself, and the separation of powers doctrine precludes any interference with the President's ability to perform a textually committed power. *See* Defs.' Mem. of 3/8/02 at 5; Defs.' Opp'n of 11/16/01 at 4–5, 8. Second, the government argues that *Egan* and its progeny make clear that Article II precludes judicial review of the merits of a denial of access to classified information. Defs.' Mem. of 3/8/02 at 7. Third, the government argues that Executive Order 12958 provides no authority for this Court to enforce its terms and therefore actions taken pursuant to the Executive Order are unreviewable. Defs.' Opp'n of 11/16/01 at 10.

Before explaining why defendants' arguments inaccurately describe separation of powers doctrine, it is important to reiterate that only one aspect of defendants' decision to deny access is arguably grounded in the text of the Constitution itself. As discussed above, defendants' explanation of their decision to deny access to Mr. Zaid has been less than consistent. The determination that plaintiff's counsel is not serving a governmental function by assisting the Court in making a proper decision on plaintiff's claims is *not* a question uniquely and exclusively dedicated by the Constitution to defendants. Defendants' argument that this Court may not review their decisions rests entirely on the assumption that defendants denied Mr. Zaid access wholly because of the sensitive nature of this information. As the declarations of Mr. Eatinger and Mr. Aly make clear, defendants' decisions rested, at best, only in part on the sensitive nature of the information. However, because the nature of the information and the potential risk to national security of its disclosure to plaintiff's counsel did in some way impact this decision, this Court must address defendants' unpersuasive separation of powers arguments.

The Supreme Court has affirmed time and again the importance of the allocation of governmental power by the United States Constitution into three coordinate branches. *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Humphrey's Executor v. U.S.*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). This separation of powers was regarded by the Framers of the Constitution as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also Mistretta v. United States*, 488 U.S. 361, 383, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("[c]oncern of encroachment or aggrandizement . . . has animated our separation of powers jurisprudence."). Thus, the Supreme Court has invalidated actions by one branch of government that impermissibly usurp the power of another coequal branch. *See, e.g., Plaut v. Spendthrift Farm*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (unconstitutional legislative assumption of judicial power); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (unconstitutional legislative assumption of executive power); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (unconstitutional executive assumption of legislative power). In addition, even when a branch of government does not assume for itself a power allocated to another, "the separation of powers doctrine requires that a branch not impair another in the performance of its

constitutional duties." *Loving v. United States,* 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); *Commodity Futures Trading Com'n v. Schor,* 478 U.S. 833, 856–57, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*Nixon II* ).

If one thing is clear from these separation of powers cases, it is that the lines that divide the powers of the three branches of government are neither absolute nor "neatly drawn." *Clinton v. Jones,* 520 U.S. at 701, 117 S.Ct. 1636. "In designing the structure of our Government and dividing and allocating the sovereign power among three coequal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence." *United States v. Nixon,* 418 U.S. 683, 707, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*Nixon I* ). Conflicts and overlap are necessary by-products of the constitutional design of checks and balances among the three branches of government.

Defendants argue that the authority of the President to control access to information that implicates national security is grounded in the text of Article II of the U.S. Constitution, and that separation of powers principles inherent in the Constitution mandate that the judiciary may not seek to infringe on a textually-based power. "[J]udicial review of a decision to deny someone access to classified information would interfere with the President's ability to perform 'a textually demonstrable constitutional commitment,' *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and would thus violate the separation of powers in our Constitution." Defs.' Mem. of 3/8/02 at 5; *see also* Defs.' Opp'n of 11/16/02 at 8. As discussed above, the textual provisions from which the President's ability to control access to in-formation that poses a risk to national security derives are the general Executive Power, Art. II, § 1(1), and the President's role as "Commander in Chief of the Army and Navy of the United States," Art. II, § 2(1). *Egan,* 484 U.S. at 527, 108 S.Ct. 818.

In support of this argument, defendants invoke cases from two distinct but related lines of precedent—the political question doctrine reflected in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and the separation of powers cases such as *Nixon I,* 418 U.S. 683, 94 S.Ct. 3090. Defendants here have blurred together political question doctrine and the views of a minority of Justices of the Supreme Court on general separation of powers questions into a broad standard that would preclude review of the exercise of any Executive power authorized by the text of the Constitution.

The distinction between political question doctrine and more general separation of powers cases is important. While political question doctrine is grounded in separation of powers concerns, it reflects only one subset of those concerns. *See Baker,* 369 U.S. at 216, 82 S.Ct. 691. As will be explained, political question doctrine applies only when adjudication of an issue by the judiciary is somehow inappropriate because that action would somehow intrude into the exclusive sphere of the executive or legislative branches. One of the several factors to be considered by a court in determining whether an issue is a political question is whether the issue is exclusively committed by the text of the Constitution to one branch of government. *Id.* In contrast, a more general body of separation of powers law has grown from conflicts between any of the three branches, including the judiciary, that arise when one branch usurps or encroaches on the power of another. *E.g., Clinton v. Jones,* 520 U.S.

681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In the context of these separation of powers cases, some members of the Supreme Court and the Executive Branch have advocated a very formal understanding of separation of powers that invokes some language of the political question doctrine. The argument has been made that the Constitution is necessarily violated any time one branch infringes any power or duty that finds its authority in a textually enumerated power in the Constitution. *See Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440, 486, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J, concurring); *Morrison v. Olson,* 487 U.S. 654, 711, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting); Defs.' Mem. of 3/8/02 at 5; Defs.' Opp'n of 11/16/02 at 8; *see also* Defendants' Motions to Dismiss filed on October 17, 2001, March 8, 2002, and April 5, 2002, in *Judicial Watch Inc v. National Energy Policy Development Group,* Civ. No. 01–1530(EGS) (D.D.C), and *Sierra Club v. Cheney,* Civ. No. 01–1530(EGS) (D.D.C.).

This Court will first explain why defendants' denial of access does not constitute a political question as defined by the Supreme Court. Second, this Court will explain why any infringement of a textually-authorized power does not necessarily violate separation of powers principles, and why judicial review of the government's action here does not impermissibly intrude on the Executive's constitutional authority.

### 1. Political Question Doctrine

Defendants initially attempted to reap the benefits of the political question doctrine without doing the work to show why it should apply. In their briefs, defendants twice cited *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), for the proposition that "judicial review [is]

precluded where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department.'" Defs.' Opp'n of 11/16/01 at 8; Defs.' Mem. of 3/8/02 at 5. Beyond these citations to *Baker v. Carr,* at no time did defendants expressly argue that the political question doctrine should apply here, nor did they apply the standards of that doctrine to the facts of this case. Only in response to this Court's Order of April 16, 2002 requesting clarification on this point, did defendants finally explain that indeed they do believe this case presents a political question. Defs.' Supp. Mem. of 4/19/02 at 1 ("[T]he question of who may have access to information bearing on national security could properly be characterized as a non-justiciable 'political question' as that term has been developed and defined by the Supreme Court.")

Thus, relying on *Baker,* defendants argue that the denial of access to classified information by the Executive branch is non-justiciable. Defs.' Supp. Mem. of 4/19/02 at 1–4. In *Baker,* the Supreme Court gave a long and detailed exposition of the then-existing political question cases and attempted to cull from those cases some general justiciability principles. 369 U.S. at 217, 82 S.Ct. 691. The Court noted that political question cases arise in various formulations, and that "each has one or more elements which identify it as essentially a function of the separation of powers." *Id.* The Court then identified the following elements:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing

lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Id.* The Court in *Baker* did not conclude that the existence of a particular type of case or formulation of the above elements *necessarily* precluded judicial review. *Id.* Rather, the Court concluded, "[t]he cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." *Id.* The Court later explained that these six elements or characteristics are not "completely separate" from each other. *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993).

The political question doctrine cases subsequent to *Baker* have made clear that this doctrine is extremely limited in application and scope. As the D.C. Circuit has stated:

> The political question doctrine is a tempting refuge from the adjudication of difficult constitutional claims. Its shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts. Recent cases raise doubts about the contours and vitality of the political question doctrine, which continues to be the subject of scathing scholarly attack ... We need not, however, announce the demise of the political question doctrine by our holding in this case. Despite confusion over whether a retreat to the political question doctrine is proper in particular cases, it is clear that the doctrine is, at best, a narrow one. *Baker v. Carr* admonishes that "[t]he doctrine ... is one of 'political question,' not one of 'political cases.'"

*Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C.Cir.1984) (*en banc*), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). In no case has the Supreme Court suggested that the standards that apply to this very limited set of cases should be extended to all separation of powers issues.

Defendants here contend that the decision to deny access to plaintiff's counsel involves a textually-committed power of the Executive branch, a policy decision improper for judicial resolution, a decision that should be left alone given the due respect for co-equal branch of government and an unusual need for unquestioning adherence to a political decision. Defs.' Br. of 4/19/02 at 3–4. Notably, however, the government has not contended that this case involves "a lack of judicially discoverable and manageable standards for resolving it." *Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### a. *Textually Committed*

In order for this Court to determine that reviewing a decision to deny access to national security information presents a nonjusticiable political question, it must, "in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed." *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); *see also Powell v. McCormack*, 395 U.S. 486, 519, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Furthermore, the Supreme Court has explained, "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon*, 506 U.S. at 228, 113 S.Ct. 732.

Here, the government argues that control of access to classified information is textually committed to the Executive Branch. The fatal flaw in the government's argument is its conflation of actions that are textually *committed* with actions that are textually *authorized*. The universe of actions that are committed by the text of the Constitution exclusively to one particular branch is very small. *See generally Baker*, 369 U.S. 186, 82 S.Ct. 691 (categorizing cases). On the other hand, the number of actions taken by the Executive Branch that derive their authority from a power described in Article II is vast. The government's argument here would effectively insulate that vast universe of Executive action from judicial review.

Defendants invoke language from *Department of Navy v. Egan*, for the proposition that the President's "authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of power in the President." 484 U.S. at 527, 108 S.Ct. 818. This Court does not disagree with this language in *Egan*, that Article II authorizes control of access. *Id.* Rather, this Court disagrees with the government's attempt to twist *Egan*'s discussion of textually-authorized activities into a textually-committed political question. As is discussed further below, *Egan* does not support defendants' separation of powers arguments here. *Egan* did not once mention political question doctrine. Defendants' contention that despite the fact that the Supreme Court never mentioned political question doctrine, "*Egan* and its progeny can easily be viewed as political question cases," gives the Supreme Court too little credit. Defs.' Br. of 4/19/02 at 3. Had that Court actually been presented with a political question, it would have analyzed the case appropriately. Defendants' attempt to move *Egan* into the category of political question cases reflects the extent to which the government misconceives political question doctrine.

It is true that the authority to classify information and control access to classified information derives from the general grant of Executive power in Article II, and from the President's role as the Commander in Chief of the Armed Forces. However, just as the *Baker* Court recognized that it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. 691, *see also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 229–30, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), so too would it be error to hold that every case that touches upon national security concerns is nonjusticiable.

The text of the Constitution does not expressly commit control over information that bears on national security to the Executive Branch. Defendants present no textual analysis of the Constitution to show why this authority should be held to be within the sole province of the Executive. *Cf. Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (holding after an extended analysis of the language of the Constitution's Impeachment Trial Clause, Art. I, § 3, cl. 6, that a challenge to impeachment procedures was nonjusticiable); *United States v. Rostenkowski*, 59 F.3d 1291 (D.C.Cir.1995) (holding after an extended analysis of language of Rulemaking Clause that the Clause is not an absolute bar to judicial interpretation of House of Representative Rules). Defendants have offered no historical analysis of the Framers' intent to show that decisions about access to national security information should be insulated from the courts. *Cf. Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (examining Founders' opinions on Impeachment Clause). Furthermore, if it

were true that control over classified information were committed by the Constitution to the Executive branch, the Supreme Court would not have upheld the judicial review of classification determinations that now exists in many contexts. *See, e.g., Snepp v. United States,* 444 U.S. 507, 513 n. 8, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (requiring judicial review of pre-publication classification determinations); *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (allowing deferential judicial review of claims of State Secrets privilege); *McGehee v. Casey,* 718 F.2d 1137 (D.C.Cir.1983) (requiring judicial review of pre-publication classification determinations); *Salisbury v. United States,* 690 F.2d 966 (D.C.Cir.1982) (allowing judicial review pursuant to Freedom of Information Act of documents withheld pursuant to national security exemption).

Finally, judicial review here is not inconsistent with the concept of separation of powers underlying our constitutional framework. In *Nixon v. United States,* for example, the Supreme Court held that judicial review was inconsistent with "the Framers' insistence that our system be one of checks and balances." 506 U.S. at 234–35, 113 S.Ct. 732. In that case, the impeachment process was designed by the Framers to be the only check on the judicial branch by the legislature. Allowing judicial review of impeachment proceedings would place final reviewing authority "in the hands of the same body that the impeachment process is meant to regulate." *Id.* at 235, 113 S.Ct. 732. Here, the Court is faced with just the opposite situation. Without judicial review, there will be no check on Executive power at all. Rather than avoiding judicial review so as not to interfere with the check on judicial power specified in the Constitution, this Court must review administrative action so as not to allow the final reviewing authority to rest "in the hands of the same body" making the decision. *Id.*

b. *Other Factors*

The government also invokes the third, fourth, and fifth factors identified in *Baker.* 369 U.S. at 217, 82 S.Ct. 691. The government argues: first, that determining access to classified information is a policy decision inappropriate for judicial resolution because the judiciary lacks the necessary expertise to assess national security risks. Defs.' Br. of 4/19/02 at 3. Second, because of the national security interests at stake, there is a need for "unquestioning adherence" to the Executive Branch's decisions. *Id.* Third, to question such decisions would express a lack of respect due a coordinate branch of government. *Id.* Once again, despite this Court's request to counsel to apply political question doctrine to the facts of this case, *see* Order of April 16, 2002, in support of these arguments the government gives only a short citation to *Egan,* which did not address or apply political question doctrine.

It is true that "[t]he political question doctrine excludes from judicial review those controversies that revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling,* 478 U.S. at 230, 106 S.Ct. 2860. However, this case does not require the Court to review a policy decision made by the government *de novo;* rather it requires this Court to interpret and apply the Constitution. Just as the Supreme Court held in *Japan Whaling* that "under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes," *id.,* so to is it emphatically the proper role of the Judiciary to interpret the Constitution. "[W]e cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.*

To be clear, this Court's review of defendants' actions is limited to determining whether defendants have violated the First Amendment. As will be explained below, that review requires no more than applying the test that was announced in *McGehee* for determining when the speech of former government employees has been impermissibly restricted. 718 F.2d at 1142–43. This Court is not required to make the type of "predictive judgment" about an individual's impact on national security about which the *Egan* Court expressed concern. 484 U.S. at 529, 108 S.Ct. 818. The Court's inquiry focuses on whether defendants' actions implicate protected speech, whether defendants' actions were intended to infringe speech, whether the interests served by defendants' actions were compelling, whether defendants' actions were based on the content or viewpoint of the speech suppressed, whether defendants' actions constitute a prior restraint on speech, and whether defendants' actions were no more restrictive than necessary to further those interests.

These inquiries could require in some part delving into the legitimacy of defendants' asserted risk to national security. For example, if the Court believes that there is no risk to national security from the potential release of the information, then the interests asserted by the government would no longer be compelling. Furthermore, if it turns out that the government denied access for reasons other than national security risk, the interests asserted by the government may no longer be compelling. The nature of the Court's inquiry into the decision made here is no more intrusive than applying the appropriately deferential standard of review for classification determinations. The Court's analysis of the First Amendment question will be conducted with appropriate deference to the expertise of the Executive Branch where such deference is warranted. *See McGehee*, 718 F.2d at 1149 (in the context of reviewing classification determinations, court should give an appropriate amount of deference to risk predictions by classification experts). However, the fact that this case may implicate an area of Executive expertise does not mean that deference must be complete.

Finally, contrary to defendants' argument, it does not show a lack of respect for the Executive Branch of government to review its actions for violations of the Constitution. Defs.' Br. of 4/19/02 at 3. Courts conduct these types of review every day. It is ironic that an Executive Branch so insistent on insulating its actions from judicial review would make arguments about a lack of respect for the constitutional mandate of a coordinate branch of government. The claim that this Court lacks the authority to enforce the First Amendment of the Constitution is not taken lightly by this Court, nor should such a claim be lightly made by the Executive Branch.

For all these reasons, none of the factors identified as hallmarks of political question doctrine in *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691, are implicated by this case. This case does not raise a political question.

### 2. General Separation of Powers Doctrine

■ In addition to invoking the political question doctrine, the government also relies on the more broad category of separation of powers cases. In arguing that this alleged interference with Executive power constitutes a *per se* violation of separation of powers principles, however, the government urges this Court to adopt a constitutional standard that has never gained the endorsement of a majority of the Supreme Court, and has recently been expressly rejected by the D.C. Circuit. The government has long argued for a more formalistic understanding of the separation of pow-

ers doctrine than the Supreme Court and other courts have been willing to accept. *See Nixon II*, 433 U.S. at 441–44, 97 S.Ct. 2777; *Nixon I*, 418 U.S. at 706–707, 94 S.Ct. 3090; *Ass'n of American Physicians and Surgeons v. Clinton*, 997 F.2d 898, 906 (D.C.Cir.1993)(*AAPS*) ("According to the government, [the Recommendation Clause] gives the President the sole discretion to decide what measures to propose to Congress, and it leaves no room for congressional interference."). In *Nixon II*, the Court rejected the government's argument for "three airtight departments" of government as "archaic." 433 U.S. at 441–44, 97 S.Ct. 2777. The Court has instead consistently embraced the view articulated by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer:*

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring), In *Mistretta*, the Court explained, the Constitution "imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" 488 U.S. at 381, 109 S.Ct. 647. Indeed, separation of powers principles do not mean that the branches of government "ought to have no partial agency in, or no control over the acts of each other." James Madison, The Federalist No. 47.

With this concept of the separation of powers doctrine in mind, the Supreme Court has never agreed with the position taken by the government here, that *any* infringement of any action *authorized* by the text of Article II is necessarily a *per se* violation of the Constitution. The Court in *Morrison v. Olson* explicitly rejected such

an argument in favor of a more nuanced approach that examines whether the action in question "impermissibly" intrudes on the constitutional authority of the Executive. *Morrison*, 487 U.S. at 696, 108 S.Ct. 2597 (holding that the act creating the independent counsel's office did not infringe on the President's ability to "perform his constitutionally assigned duties"); *see also Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (holding that a civil lawsuit against a sitting President did not constitute an impermissible intrusion by judiciary into ability of President to fulfill duties). In *Morrison*, Justice Scalia's argument in dissent that the "executive power" described in Article II of the Constitution "does not mean *some of* the executive power, but *all of* the executive power" gained the support of no other Justice. 487 U.S. at 711, 108 S.Ct. 2597 (Scalia, J., dissenting). In his lone dissent, Justice Scalia argued for a "clear constitutional prescription that the executive power belongs to the President" and against the majority's "balancing test." *Id.* The majority of the Court opted to apply a balancing test to determine whether Congress had "impermissibly" intruded on the executive power. In *Public Citizen,* three Justices of the Court argued again for a brightline rule that any infringement of a textually authorized authority was a per se violation. 491 U.S. at 486, 109 S.Ct. 2558 (Kennedy, J. concurring). Once again, that view did not persuade a majority of the Justices, who invoked the doctrine of constitutional avoidance to interpret the Federal Advisory Committee Act (FACA) so as to avoid a constitutional challenge.

In *AAPS,* the D.C. Circuit adopted the *Public Citizen* majority's approach and declined to reach the constitutionality of FACA. 997 F.2d 898. In so doing, however, the Circuit Court devoted a lengthy discussion to the flaws in the argument offered by the government that infringe-

ment on textual powers *per se* violates Article II.[8]

The implications of the bright-line rule advocated by the government are stunning. Even if this Court were to consider the proper separation of powers standard without the benefit of precedent, it would reach the conclusion that the government's position is untenable. Any review by a court of an Executive branch denial of access to potentially classified information would be impermissible regardless of the motivation or impact of that government action. Denials of access to classified information for reasons other than national security and that would constitute egregious violations of other Constitutional rights in other circumstances would go unchecked. For example, the government could blatantly deny access to plaintiff's counsel in retaliation for Mr. Stillman's exercise of his First Amendment rights. Further, the government could deny access to plaintiff's counsel solely on the basis of his gender, race, or religion. The formalistic, bright-line rule advocated by the Executive Branch here would result in the enlargement of Executive power at the expense of the other branches of government, and to the detriment of individuals' Constitutional rights.[9] To be clear, the government's argument regarding the separation of powers would render unreviewable any action by a federal agency that derives its authority from the text of Arti-

cle II, including the very general grant of power to take care that the laws be faithfully executed. Art. II, Sec. 3. To borrow the words of the D.C. Circuit in *Nixon v. Sirica*, "[s]upport for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers." 487 F.2d 700, 715 (D.C.Cir.1973).

The government attempts to support its argument primarily by an inaccurate citation to *Public Citizen*. Defendants cite *Public Citizen* for the proposition that "[w]here a power has been committed to a particular Branch of the Government in the text of the Constitution, the balance already had been struck by the Constitution itself. It is improper for this Court to arrogate to itself the power to adjust a balance settled by the explicit terms of the Constitution." 491 U.S. 440, 486, 109 S.Ct. 2558 (Kennedy, J., concurring). Defendants failed to acknowledge that this quote is found in the *concurring* opinion rather than the *majority*. Defs.' Br. of 11/16/01 at 8. As explained above, this argument by the concurring Justices did not persuade the majority of the Court and is not controlling law.

In sum, simply finding the authority for an Executive action in Article II, however, is not enough to insulate that action from constitutional scrutiny. Nothing in the cases cited by the government supports

---

8. While the D.C. Circuit's discussion of the constitutional issue raised by the application of FACA to the Health Care Task Force was arguably dicta because the Court ultimately declined to decide the constitutional issue, the Court explained that it was necessary to determine the strength of the constitutional argument raised by the government prior to applying the doctrine of constitutional avoidance. 997 F.2d at 906 ("It is, of course, necessary before considering the maxim of statutory construction to determine whether the government's constitutional argument in this case is a powerful one. In other words,

are we truly faced, as the Court thought it was in Public Citizen, with a grave question of constitutional law?"). The Court rejected the government's constitutional standard but believed that the constitutional concerns raised were serious.

9. At oral argument defense counsel attempted to argue that application of this standard would not prevent the Court from reviewing claims of racial or gender discrimination. The standard as it has been articulated by the government, however, supports no such distinction.

diverging from the strong presumption of judicial review of constitutional claims.

Regardless of the constitutional standard to be applied, defendants argue that the issue of reviewability of access decisions has already been resolved. Contrary to defendants' argument, however, judicial review of the decision to deny plaintiff's counsel access to allegedly classified information does not contravene the holding of *Department of the Navy v. Egan* or other precedent. 484 U.S. 518, 525, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)

The question before the Court in *Egan* was whether the Merit Systems Protection Board (MSPB) had the *statutory* authority to review the propriety of the denial of a security clearance when an employee appealed his for cause discharge based on that security clearance denial. 484 U.S. at 520, 108 S.Ct. 818. In contrast, the question before this Court is whether an Article III federal court has the *constitutional* authority to review the denial of access to classified information.

The procedural history of *Egan* is worth reviewing. During Mr. Egan's security clearance investigation, the Navy became aware that Mr. Egan had a criminal history and a drinking problem. The Navy denied Mr. Egan clearance and terminated him because a clearance was necessary for his job. Mr. Egan appealed to the MSPB. The presiding official initially ruled that the MSPB did have the authority to review the merits of a security clearance denial, and that because the Navy had not submitted a reasoned explanation connecting Mr. Egan's criminal record and alcoholism with a threat to national security, his denial was improper. The full Board of the MSPB reversed on the grounds that it could not review the merits of a clearance determination. Respondent filed a direct appeal to the Court of Appeals for the Federal Circuit. A divided court reversed and remanded for the MSPB to determine whether the security clearance was properly denied.

The Supreme Court reversed, holding that Congress did not intend for the MSPB to review the substance of such security clearance denials as part of the statutorily created appeals process. 484 U.S. at 528–29, 108 S.Ct. 818. The Court discussed the constitutional implications of holding otherwise and, based on the Article II concerns raised by the review of the substance of a security clearance determination by the MSPB, interpreted the statute narrowly to avoid those concerns. The Court did *not* hold that review of the merits of a security clearance denial by either the MSPB or a court would *violate* Article II of the Constitution, as the government has argued here.

Furthermore, the Court explained in detail that the reason that the President's Article II power would be threatened by the MSPB review was the nature of the "predictive judgment" required by the security clearance standard. *Id.* at 529, 108 S.Ct. 818. "The general standard is that a clearance may be granted only when 'clearly consistent with the interests of national security.'" *Id.* at 528, 108 S.Ct. 818. As the Court explained, determining whether granting a person a clearance is clearly consistent with national security interests "is only an attempt to predict his possible future behavior and assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information .... The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the 'grant or denial of security clearances ... an inexact science at best.'" *Id.* (citations omitted). Further, the "predictive judgment" of determining the individual's potential risk to national security:

must be made by those with the necessary expertise in protecting classified information . . . . Certainly it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.

*Id.*

The *holding* of *Egan* does not apply to this case because that Court was not faced with the question of whether judicial review of a decision to deny access to classified material can be required by the constitution. The government's attempt to read into *Egan's* discussion of Article II a blanket ban on judicial review of challenges to access decisions places more weight on that discussion than it can bear. Furthermore, the *reasoning* of *Egan* does not control this Court's decision for two reasons: first, even if the President has great discretion pursuant to Article II of the Constitution to determine who has access to classified information, *Egan* says nothing about what happens when an exercise of that discretion conflicts with another provision of the Constitution. And, second, the nature of the decision made by the Navy that was at issue in *Egan*, whether an individual presented a risk to national security, is *not* the nature of the decision made by DOD and the CIA in this case.

The "predictive judgment" about an individual's risk to national security with which the Court in *Egan* was so concerned, and the Article II implications that follow, does not accurately describe the judgment that the DOD and the CIA claim

to have made in this case. Defendants' decisions to deny access did not reflect a predictive judgment about the risk to security posed by a particular individual. They were not engaged in the "inexact science" of "attempt[ing] to define not only the individual's future actions, but those of outside and unknown influences." *Egan*, 484 U.S. at 528, 108 S.Ct. 818. Rather, defendants' decisions reflected in part a concern with the sensitive nature of the *information*. The *Egan* Court said nothing about the assessment of the risk to national security posed by information. Challenges to the proper classification of information are not beyond the review of this Court. *Snepp*, 444 U.S. at 513 n. 8, 100 S.Ct. 763; *McGehee*, 718 F.2d at 1140. For all these reasons, the *Egan* decision does not constrain this Court's authority to address plaintiff's First Amendment challenge.

Furthermore, other precedent from the Supreme Court, the D.C. Circuit, and the Ninth Circuit supports holding defendants subject to judicial review here. In 1988, the Supreme Court decided *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). *Webster* holds that the CIA's decision to terminate an employee because his sexual orientation posed a security risk was an action committed to agency discretion by statute, the National Security Act of 1947, but was subject to judicial review for constitutional violations. *Id.* at 601, 605, 108 S.Ct. 2047. With respect to the constitutional violations alleged by plaintiff, the Court remanded for further consideration by the District Court.[10] *Id.* at 605, 108 S.Ct. 2047. Despite the fact that the denial of employment in *Webster* was allegedly based on a security risk assessment, the Court treat-

---

**10.** Because the District Court granted relief on plaintiff's APA claim it declined to reach

plaintiff's constitutional claims.

ed the issue before it as one of the CIA's authority to terminate an employee, not to deny a security clearance. The Court did not discuss the applicability of its earlier holding in *Egan* at all. Thus, while *Webster* does hold that judicial review is available for constitutional challenges to CIA hiring and firing decisions, it does not specifically support judicial review of a security clearance decision. The relevance of *Webster* to this case beyond the proposition that courts generally have the jurisdiction to hear constitutional claims, comes from that Court's discussion of a separation of powers argument raised by the government at oral argument. *Id.* at 603, 108 S.Ct. 2047.

At oral argument in *Webster*, the government argued that allowing judicial review of petitioners' constitutional claims "will entail extensive 'rummaging around' in the Agency's affairs to the detriment of national security." *Id.* Similarly, the government has argued here that judicial review of defendants' denial of access will impermissibly intrude on the role of the executive branch in protecting national security. The *Webster* Court dismissed this argument with a very brief discussion. The Supreme Court stated that Title VII lawsuits "attacking the hiring and promotion policies of the Agency are routinely entertained in federal court," and the "inquiry and discovery associated with those proceedings would seem to involve some of the same sort of rummaging." *Id.* Then the Supreme Court stated the following:

> Furthermore, the District Court has the latitude to control any discovery process which may be instituted so as to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission.

*Id.* Defendants attempt to argue that this passage supports their position because

> it would appear that the *Webster* Court recognized that the district court could not order the government to disclose classified information despite any asserted need by the respondent for that information in order to establish the alleged constitutional violation-otherwise this statement would have not been the reassurance to the government it was clearly intended to be.

Defs.' Supp. Mem. of 2/8/2002 at 10. In addition to being purely speculative, this argument is simply wrong. The *Webster* Court recognized and validated the district court's ability to balance interests of a plaintiff pursuing constitutional claims against the government's interest in maintaining the confidentiality of information. Nothing in the *Webster* decision suggests that the outcome of this balance is predetermined in favor of the government. Indeed, the very ability to balance these interests, the ability recognized and applauded by the *Webster* Court, is the ability that defendants argue this Court lacks. The passage defendants attempt to twist in their favor actually supports this Court's ability to review the constitutional conflict at issue here. Insofar as the *Webster* decision is relevant to the question before this Court, it stands as a recognition by the Supreme Court that district courts have the ability and jurisdiction to balance and resolve the conflict between a plaintiff's need for access to information in order to prosecute constitutional claims and the government's interest in protecting classified information.

In *National Federation of Federal Employees v. Greenberg*, the D.C. Circuit rejected yet another argument by the United States that the constitutionality of security clearance procedures was not subject to judicial review, holding that: "It is simply

not the case that all security-clearance decisions are immune from judicial review." 983 F.2d 286, 289 (D.C.Cir.1993). *Greenberg* involved a constitutional challenge to the methods employed by the DOD in conducting security clearance investigations. *Id.* at 287. Plaintiffs argued that several questions asked by DOD in conducting these investigations violated plaintiffs' constitutional rights to privacy and against self-incrimination. The government argued, relying on *Egan*, that the methods used to conduct a security clearance investigation were exclusively committed to the Executive branch of government by Article II of the Constitution and were therefore beyond judicial review. *Id.* at 289.

The D.C. Circuit rejected the government's nonjusticiability argument. *Id.* The D.C. Circuit contrasted the case before it with *Egan*, and refused to hold that the methods and procedures used by the government of conducting security clearances are not subject to judicial review for constitutional violations. *Id.* In explaining that holding, the D.C. Circuit indicated that insulating the substance of a security clearance determination from constitutional review would be problematic. *Id.* The Court, however, expressly recognized that review of the substance of a clearance decision was not before the Court. *Id.* at 290. To reach this conclusion, the D.C. Circuit relied on *Webster v. Doe.* The court did acknowledge the distinction between the executive branch's power to terminate an employee, grounded in a statute, and the Executive's power to control access to information, derived from the Constitution. With respect to whether that distinction was fatal to the contention that constitutional challenges to security clearance decisions were subject to judicial review, the Circuit Court stated: "The Court in *Webster v. Doe* did not mention any such distinction and its significance is far from evident." *Id.*

The holding in *Greenberg* expressly does not extend to constitutional challenges to the substance rather than procedure of a security clearance determination. *Id.* The only Circuit faced with such a challenge, the Ninth Circuit, has upheld the jurisdiction of courts to hear constitutional challenges to the substance of security clearance decisions with minimal discussion. *See, e.g., High Tech Gays v. DISCO*, 895 F.2d 563 (9th Cir.1990) (holding that defendants' policy of conducting mandatory investigations of all gay applicants for Secret or Top Secret clearances did not violate equal protection or First Amendment); *Dubbs v. CIA*, 866 F.2d 1114, 1120–21 (9th Cir., 1989) (affirming district court's lack of jurisdiction to hear APA challenge to security clearance denial but remanding for district court to consider Dubbs' claim that the CIA unconstitutionally discriminated against homosexuals in making security clearance determinations).

In contrast to these cases, defendants cite several cases in support of their argument in which Circuit Courts, relying on the Supreme Court's discussion of Article II implications of reviewing the merits of a security clearance determination in *Egan*, held that federal District Courts have no jurisdiction over lawsuits predicated on a challenge to the merits of a security clearance determination. *See, e.g., In re United States*, 1 F.3d 1251 (Table), 1993 WL 262656 (Fed.Cir. April 19, 1993); *Guillot v. Garrett*, 970 F.2d 1320 (4th Cir.1992); *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir.1990). The D.C. Circuit has not addressed this question directly, but has held that a Title VII suit must be dismissed pursuant to *Egan* if the adverse employment action is allegedly based on a security clearance denial. *See Ryan v. Reno*, 168 F.3d 520 (D.C.Cir.1999). However, *none* of these cases dismissed a *constitutional* challenge to the security clearance denial for a lack of jurisdiction.

These cases deserve closer scrutiny than defendants provide. Defendants place much stock in the Federal Circuit's unpublished opinion granting a writ of mandamus to the United States that overturned a Court of Federal Claims' decision ordering access on behalf of plaintiffs to classified information. *In re United States*, 1 F.3d 1251 (Table), 1993 WL 262656 (Fed. Cir. April 19, 1993). The writ arose out of a discovery dispute between the United States and two defense contractors, McDonnell Douglas and General Dynamics, who were suing the government pursuant to contract law. During discovery, the plaintiffs requested access for 17 people to highly classified information involving the production of stealth aircraft and other programs.[11] The acting Secretary of the Army denied access pursuant to Executive Order 12356. The Court of Federal Claims ordered the Army to provide access to the information. The Federal Circuit relied on *Egan* to overrule the Court of Federal Claims, holding that the Secretary of the Army's decision to deny access, absent a statute directing otherwise, was not subject to judicial review.

Importantly, in *In re United States*, the plaintiffs' claim to the classified information was not based on the Constitution. Plaintiffs argued only that the trial court's authority and discretion to control discovery justified review of the access denial. This Court takes no issue with the Federal Circuit's decision that the discretionary authority of a Court to control the discovery process generally presents an insufficient counterweight to the Executive's constitutionally-grounded authority to control access to classified information. *Id.* at *9 ("Because this power is rooted in the Constitution, separation of powers is implicated and bars judicial review of any exercise of that power, at least where, as here, no specific statute purports to provide to the contrary.") However, contrary to defendants' arguments here, the Federal Circuit's conclusion is not at all dispositive of the issue of whether an Article III Court is obligated by the Constitution itself to review a constitutional challenge to an access denial.[12]

In *Ryan v. Reno*, three Irish–Americans with dual citizenship, who were denied employment with INS because they were denied security clearances, sued under Title VII of the 1964 Civil Rights Act for discrimination in employment on account of national origin. 168 F.3d at 521. The D.C. Circuit upheld the dismissal of that suit for lack of jurisdiction on the ground that even if plaintiffs established a prima facie case of discrimination under the *McDonnell Douglas* test,[13] the court could

**11.** The information at issue in *In re United States* was classified at a level more restrictive than Secret or Top Secret.

**12.** In the underlying litigation between McDonnell Douglas, General Dynamics, and the United States, the plaintiffs eventually sought access for plaintiff's counsel to this information. The issue of access by plaintiff's counsel was not raised in the first *In re United States* opinion discussed above. In response to this request for access, the United States invoked the State Secrets privilege. After the Court of Federal Claims again ordered access, the United States again filed a writ of mandamus with the Federal Circuit. In an opinion issued 11 days after the first *In re United States* decision, the Federal Circuit reversed, holding that the trial court had improperly applied the State Secrets doctrine and that the United States had sufficiently proven the requisite elements of the privilege. *In re United States*, 1 F.3d 1251 (Table), 1993 WL 262658 (Fed.Cir. April 30, 1993). As will be discussed below, although the Federal Circuit rejected plaintiffs' First Amendment challenge to the access denial grounded in their right to confer with counsel, that Court did recognize its responsibility to review the substance of the assertion of the States Secrets privilege.

**13.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

not review the defendants' proffered legitimate non-discriminatory reason for the denial of employment. Relying on *Egan*, the D.C. Circuit joined three other Circuits in holding that the Court could not review the merits of the decision not to grant a security clearance when offered as the non-discriminatory explanation for defendant's action in a Title VII suit. *Id.* at 524–25; *see also Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir.1996); *Perez v. FBI*, 71 F.3d 513 (5th Cir.1995); *Brazil v. United States Dep't of the Navy*, 66 F.3d 193, 195 (9th Cir.1995). Once again, however, the *Ryan* decision says nothing about judicial review of a constitutional challenge. While both *Perez* and *Brazil* involved constitutional *Bivens* claims, those claims were dismissed because Title VII provided the exclusive remedy for this challenge to an adverse employment action. 71 F.3d at 515, 66 F.3d at 198.

In *Dorfmont*, a former defense contract worker challenged the revocation of her security clearance on many grounds, including several that went to the merits of the determination that she posed a risk to national security, and two constitutional due process claims. 913 F.2d 1399 (9th Cir.1990) Relying on the Supreme Court's decisions in *Egan* and *Webster*, the Ninth Circuit held that the District Court had no jurisdiction to hear plaintiff's challenges to the merits of the determination that her access could not be said to be "clearly consistent with the national interest." *Id.* at 1402. However, the Ninth Circuit then held that it did have jurisdiction to hear her due process claims. *Id.* (citing *High Tech Gays v. DISCO*, 895 F.2d 563 (9th Cir.1990) and *Dubbs v. CIA*, 866 F.2d 1114, 1120–21 (9th Cir., 1989)).

Similarly, the Fourth Circuit in *Guillot v. Garrett*, 970 F.2d 1320 (4th Cir.1992), was not faced with the question of whether *all* judicial review of security clearance determinations is precluded. The only

question before that court was whether Congress had expressed sufficient intent in the Rehabilitation Act or the Civil Rights Act of 1964 to authorize review of the substantive decision to deny a security clearance. Comparing those statutes to the statute at issue in *Egan*, 5 U.S.C. § 7513, the Court held that Congress had no such intent and therefore the Court was without jurisdiction to hear that statutory claim. *Id.* at 1326.

Thus, in none of these cases—*Ryan v. Reno*, 168 F.3d 520 (D.C.Cir.1999), *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir.1996), *Perez v. FBI*, 71 F.3d 513 (5th Cir.1995), *Brazil v. United States Dep't of the Navy*, 66 F.3d 193, 195 (9th Cir.1995), *In re United States*, 1 F.3d 1251 (Table), 1993 WL 262656 (Fed.Cir. April 19, 1993), *Guillot v. Garrett*, 970 F.2d 1320 (4th Cir.1992), or *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir.1990)—did a court actually hold that it lacked jurisdiction to hear a constitutional challenge to a security access denial. In contrast, the only court squarely faced with a constitutionally based challenge, has three times held that such claims are reviewable. *See Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir.1990); *High Tech Gays v. DISCO*, 895 F.2d 563 (9th Cir.1990) *Dubbs v. CIA*, 866 F.2d 1114, 1120–21 (9th Cir., 1989).

### 3. Conclusions

To be clear, the government's argument that its actions are beyond the review of this Court rests on a theory of separation of powers that is not and has never been the law. The implications of the arguments put forth by the government in this case are stunning. The government argues here that any and all conflicts between national security interests and individual constitutional rights can not be resolved by the Article III courts because the Constitution commits the protection of

national security to the Executive Branch. If this were the law, the Pentagon Papers case, *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), which allowed the publication of classified material, was wrongly decided. If this were the law, *Snepp*, 444 U.S. at 513 n. 8, 100 S.Ct. 763, and *McGehee*, 718 F.2d at 1141, which require judicial review of pre-publication classification decisions, were wrongly decided. If this were the law, the provision of the Freedom of Information Act that allows judicial review of documents withheld for national security purposes, 5 U.S.C. § 552(b)(1), would be unconstitutional. If this were the law, the provisions of the Classified Information in Prosecutions Act, 18 U.S.C.App.3, §§ 1–16, that require disclosure of classified information to criminal defense counsel, would be unconstitutional. Finally, if the government's theory of separation of powers carried the day, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in the Supreme Court held that the President unconstitutionally assumed the legislative power in the name of national security, was wrongly decided.

In conclusion, the conflict between the constitutional powers implicated here, the Executive's power to protect national security, the Judiciary's power to resolve constitutional questions, and the plaintiff's constitutional right to free speech, can and must be resolved by this Court. As the Supreme Court concluded in *Nixon I*, "[w]e reaffirm that it is the province and duty of this Court 'to say what the law is.'" 418 U.S. at 704, 94 S.Ct. 3090 (*quoting Marbury v. Madison*, 5 U.S. (1 Cranch) at 177, 2 L.Ed. 60).

#### 4. Review of the Executive Order

Finally, the government also argues that any attempt by plaintiff to review the application of Executive Order 12958 is pre-cluded because that Executive Order is not enforceable. While this Court agrees that Executive Order 12958 creates no private right of action, this is irrelevant. Plaintiff has sued pursuant to the Constitution, and as discussed above, the Constitution provides the authority for this Court to review the government's actions.

### II. Defendants' Denial of Access to Plaintiff's Attorney to Allegedly Classified Portions of Plaintiff's Manuscript Violates Plaintiff's First Amendment Rights.

"The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic. . . ." *New York Times Co. v. United States*, 403 U.S. 713, 719, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J. concurring). Defendants in this case argue that no matter the strength of plaintiff's First Amendment interests in speaking freely with his counsel about the information contained in his manuscript and in reasonable pre-publication review procedures that serve to ensure that only properly classified information is withheld from publication, those interests are necessarily outweighed by the government's interest in controlling access to information that implicates national security. Defendants would have this Court concoct a blanket rule by which these First Amendment interests are stifled upon the invocation of security interests by the government. The First Amendment, however, requires more from defendants than that. *Cf. New York Times*, 403 U.S. at 725, 91 S.Ct. 2140 (Brennen, J., concurring) ("The entire thrust of the Government's claim throughout these cases has been that publication of the material sought 'could' or 'might' or

'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result.").

The issues raised by this case are rarely litigated. The vast majority of pre-publication clearance reviews are resolved administratively, without resort to the courts. It is undisputed that in many of those administrative proceedings, counsel for the author of the documents in question have been granted access to the allegedly classified material at issue. See Eatinger Decl. at ¶¶ 10–11. Indeed, both plaintiff's counsel and counsel for amicus ACLU have participated in such pre-publication administrative reviews in the past. Therefore, the issue of access by counsel to the allegedly classified information rarely arises in the pre-publication context, and indeed has never been litigated in federal court. Thus, this Court is presented with a complicated and difficult First Amendment question of first impression.

## A. Defendants' Denial of Access Implicates Two Speech Interests

■ Defendants' denial of access to plaintiff's counsel implicates two different First Amendment interests: plaintiff's interest in consulting freely with counsel, and plaintiff's interest in proper classification determinations during the pre-publication review process. The government concedes that both these interests are implicated by this case: "defendants do not dispute that plaintiff has a First Amendment interest in challenging the government's classification decisions and in being able to retain and consult with an attorney

in bringing such a challenge." Defs.' Mem. of 3/8/2002 at 17.[14]

### 1. First Amendment Interest in Speaking Freely to Counsel

This Circuit has recognized an individual's First Amendment interest in communicating with an attorney. See Jacobs v. Schiffer, 204 F.3d 259 (D.C.Cir.2000); Martin v. Lauer, 686 F.2d 24 (1982); see also Denius v. Dunlap, 209 F.3d 944, 954 (7th Cir.2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir.1990) ("The right to retain and consult an attorney . . . implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech."). Like this case, both Jacobs and Martin involved government restrictions on what information employees could give to their lawyers in contemplation of litigation against the government.

These holdings are buttressed by Supreme Court precedent recognizing a constitutional right of unfettered access to counsel. It has long been recognized by the Supreme Court that the First Amendment prohibits the government from interfering with collective action by individuals to seek legal advice and retain legal counsel. See United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585–86, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); United Mine Workers of Am. v. Illinois State Bar Ass'n, 389 U.S.

---

**14.** Because the Court recognizes the two First Amendment interests discussed here, the Court need not determine whether other interests asserted by plaintiff and amicus, including the right of the public to receive the unclassified information in plaintiff's manuscript, are sufficient to outweigh the government's national security interest.

217, 221–22, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("[T]he freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights."); *see also Brotherhood of R.R. Trainmen v. Virginia*, 377 U.S. 1, 6, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *NAACP v. Button*, 371 U.S. 415, 429–30, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). So too is an individual's ability to consult with counsel on legal matters constitutionally grounded. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) ("Underlying [the collective action cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much force to aggrieved individuals as it does to groups."); *see also Trainmen*, 377 U.S. at 7, 84 S.Ct. 1113 ("A State could not ... infringe in any way the right of individuals and the public to be fairly represented in lawsuits...."). Furthermore, the right to obtain legal advice applies equally to legal representation acquired for any purpose—including to advocate a political or social belief, *see Button*, 371 U.S. at 419–20, 83 S.Ct. 328, or to recover damages in a personal injury suit, *see United Mine Workers*, 389 U.S. at 223, 88 S.Ct. 353. In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter. *Denius v. Dunlap*, 209 F.3d at 954.

The First Amendment interest in speaking freely to counsel is "interwoven" with the fundamental and constitutionally protected right of access to the courts. *Martin*, 686 F.2d at 32. Without the right of access to the courts, "all other legal rights would be illusory." *Id.* Meaningful access to the courts is contingent on the ability of an attorney to give sound legal advice, and "[r]estrictions on speech between attorneys and their clients directly undermine the ability of attorneys to offer sound legal advice." *Id.* It is true that none of the cases cited above address the question of the appropriate balance between an individual's right to consult with counsel and the government's interest in protecting national security information. However, the strength of the interest asserted by the government to counterbalance plaintiff's First Amendment interests does not negate the implication of plaintiff's interests here.

Plaintiff's ability to receive sound advice from counsel as to the legality of the government's classification decisions has been infringed by defendants' denial of access to plaintiff's attorney. Plaintiff is unable to speak freely with his attorney about the content of his manuscript; indeed, he may not speak at all about the portions that defendants claim are classified. As the Supreme Court has recognized, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn Co. v. United States*, 449 U.S. 383, 390–91, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Indeed, plaintiff has a "legitimate interest in an early assessment of [his] legal rights." *Id.*

The individual who made the decision to deny access to Mr. Zaid on behalf of the DOD has asserted that Mr. Zaid's assistance is not required for plaintiff to challenge defendants' classification determinations. *See* Aly Decl. at ¶ 14. This argument ignores the significant and unique role an attorney plays in analyzing the facts and law, and in rendering assistance to his or her client. Specifically, Mr. Aly stated that:

> To the extent Mr. Zaid seeks access to this information in order to assist the Court in its governmental function of ruling on the merits of Mr. Stillman's

claims, Mr. Zaid does not require access to the information at issue in order to render such assistance. As an attorney, and officer of the Court, he can perform many important functions, including advising the Court (and his client) about the relevant case law and the legal issues he has identified. To the extent that it becomes appropriate for Mr. Stillman to submit any information that may be classified, Mr. Zaid can also advise him as to the procedures for making such a submission to the Court, and any relevant Local Rules. None of this requires access to the classified information at issue.

Aly Decl. at ¶ 14(b). These conclusions about the importance of plaintiff's attorney to the prosecution of plaintiff's claims deserve no deference from this Court. Mr. Aly's assumptions about the importance of counsel conflict with Supreme Court and D.C. Circuit precedent holding that plaintiff's interest in conferring with counsel is legitimate and fundamental. The assertion that Mr. Zaid can as effectively assist plaintiff in challenging the legality of specific classification determinations without access to the information at issue is, to say the least, unpersuasive. An attorney's role is not limited to informing the court about the general contours of classification law and instructing his client on the procedures for making court filings. While at the end of the day whether the First Amendment *requires* access to this information depends on a balancing of the interests at stake here, the Court refuses to accept the suggestion by defendants that Mr. Zaid's assistance is somehow irrelevant to plaintiff's ability to meaningfully assert his constitutional rights. Regardless of the opinion of defendants' declarant, plaintiff's legitimate and fundamental interest in consulting with his attorney and the corresponding right of meaningful access to the courts have indeed been infringed by defendant's actions here.

The fact that plaintiff's First Amendment interests have been implicated in no way ends this Court's inquiry. *Jacobs* and *Martin* make clear that an individual's right to confer with counsel is not absolute, and must be balanced against whatever legitimate interests the government asserts for restricting the disclosure of information: "It has long been clear that the First Amendment does not provide a federal employee seeking legal advice regarding a dispute with *carte blanche* authority to disclose any and all confidential government information to the employee's attorney, but rather that the scope of the First Amendment right is determined by balancing the employee's interests in communication with the government's interest in preventing communication." *Jacobs*, 204 F.3d at 265; *accord Martin*, 686 F.2d at 31. The precise contours of the balancing test that applies in the context of national security information are discussed below.

Finally, the right to speak with counsel asserted by plaintiff in this case is not the right to communicate information to Mr. Zaid *per se*, but to counsel who satisfies the government's reasonable criteria for trustworthiness. The government's legitimate need to investigate the trustworthiness of those to whom classified information will be disclosed is uncontested. The government has not denied access to Mr. Zaid in this case based on any particular concern that he as an individual poses a particular risk of disclosure. The letters to Mr. Zaid from Mr. Eatinger and Mr. Aly, as well as the Eatinger and Aly declarations make clear that the government has not yet conducted any investigation into Mr. Zaid's background because defendants concluded he lacked the requisite need-to-know. Such an investigation will have to be completed prior to Mr. Zaid or any other counsel accessing the information at issue in this case.

## 2. First Amendment Interest in Reasonable Procedures in Pre–Publication Process

In addition to his First Amendment interest in consulting with counsel, plaintiff also has a First Amendment right to publish unclassified information, and a corresponding interest in ensuring that the government's pre-publication review process is reasonably structured to prevent publication only of *properly* classified material. *McGehee v. Casey*, 718 F.2d 1137 (D.C.Cir. 1983). The constitutionality of employment agreements, such as the one signed by plaintiff, that require current and former government employees who have been entrusted with access to classified information in the course of their government service to submit writings for pre-publication review has been recognized by the Supreme Court. *See Snepp*, 444 U.S. at 513, 100 S.Ct. 763; *see also McGehee*, 718 F.2d at 1140–41; *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir.1975); *United States v. Marchetti*, 466 F.2d 1309 (4th Cir.1972).[15] However, while the scope of government employees' free speech rights may be in some ways narrower than those of private citizens, government employees do not relinquish their First Amendment rights at the door of public employment. *See, e.g., Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 672, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Mount Healthy City School Dist. Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

It is a basic principle of First Amendment law that "[a]ny system of prior restraint of expression comes to this Court bearing a heavy presumption against its constitutional validity...," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). *United States v. Marchetti* was the first case to hold that the employee non-disclosure agreements mandating pre-publication review could overcome the heavy presumption against systems of prior restraint based on the government's interest in maintaining the secrecy of national security information. 466 F.2d at 1317. The District Court in *Marchetti* granted an injunction prohibiting Mr. Marchetti, a former CIA official, from publishing any writing containing information gained during his CIA employment without submitting that writing for pre-publication review. On appeal to the Fourth Circuit, Mr. Marchetti argued that this injunction violated his First Amendment rights. The Fourth Circuit rejected Mr. Marchetti's argument, holding that "the Government's need for secrecy in this area lends justification to a system of prior restraint against disclosure by employees and former employees of classified information obtained during the course of employment." *Id.* at 1316–17.[16]

In *Snepp*, the Supreme Court agreed with the Fourth Circuit's earlier holding in

---

**15.** These cases all make clear that government employees who enter secrecy agreements retain the right to challenge the pre-publication review as violative of the First Amendment. *McGehee*, 718 F.2d at 1140–41; *Alfred A. Knopf*, 509 F.2d at 1367; *Marchetti*, 466 F.2d at 1317. The government's argument that Stillman "should not be allowed to complain about the restriction on his speech," Defs.' Mem. of 3/8/02 at 18, because he signed a confidentiality agreement is specious and ignores precedent.

**16.** *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir.1975) resulted from the Fourth Circuit's decision in *Marchetti*. After the Fourth Circuit enjoined publication, Mr. Marchetti submitted his manuscript for pre-publication review. Displeased with the CIA's classification determinations, Mr. Marchetti and his publisher, Alfred A. Knopf, Inc., sued to contest those classifications on First Amendment grounds.

*Marchetti.* 444 U.S. at 513 n. 8, 100 S.Ct. 763. In *Snepp,* a former CIA official published a book about his experiences in the CIA without submitting the book for pre-publication review pursuant to his employee non-disclosure agreement. The Supreme Court held that Mr. Snepp had breached his fiduciary duty arising out of that agreement, and upheld the imposition of a constructive trust on all profits from that book. In so holding, the *Snepp* Court cited with approval the *Marchetti* decision, and held, "Snepp's contract, however, requires no more than a clearance procedure subject to judicial review." *Id.* at 513 n. 8, 100 S.Ct. 763.

In *McGehee,* the D.C. Circuit approved and further detailed the constitutional requirements for the pre-publication process. 718 F.2d 1137. Mr. McGehee, a former CIA employee, submitted his manuscript for pre-publication review pursuant to his non-disclosure agreement, and was dissatisfied with the CIA's classification decisions. *Id.* Mr. McGehee sued, challenging the substance of the classification decisions and arguing that the system of classification into "top secret," "secret," and "confidential" categories was vague and overbroad in violation of the First Amendment. *Id.* Relying on *Snepp* and *Marchetti,* the D.C. Circuit upheld the pre-publication review process, the system of classification categories, and the substantive classifications. *Id.*

Although *Marchetti,* 466 F.2d at 1317, *Snepp,* 444 U.S. at 513 n. 8, 100 S.Ct. 763, and *McGehee,* 718 F.2d 1137,[17] allow this system of prior restraint to exist, they establish important restrictions on the government's ability to censor publication. The government may not constitutionally censor unclassified material or material obtained from public sources. *McGehee,* 718 F.2d at 1141; *Marchetti,* 466 F.2d at 1313. As the D.C. Circuit explained, "[t]he government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." *McGehee,* 718 F.2d at 1141 (*citing Snepp,* 444 U.S. at 513 n. 8, 100 S.Ct. 763). The importance of this principle can not be overstated. Because the government has no legitimate interest in preventing the publication of unclassified information, the pre-publication process must be aimed at ensuring that the only information that is prevented from being published is *properly* classified information. *Id.* at 1148 ("McGehee therefore has a strong first amendment interest in ensuring that CIA censorship of his article results from a *proper* classification of the censored portions.") (emphasis in original). Furthermore, the government must act promptly in completing the pre-publication review. *Marchetti,* 466 F.2d at 1317 ("Undue delay would impair the reasonableness of the restraint, and that reasonableness is to be maintained if the restraint is to be enforced."). Finally, as discussed above, the First Amendment requires that classification decisions themselves must be subject to judicial review. *Snepp,* 444 U.S. at 513 n. 8, 100 S.Ct. 763; *McGehee,* 718 F.2d at

**17.** In addition to *Snepp, Marchetti, McGehee,* and *Alfred A. Knopf,* the universe of case law on the pre-publication review process and the First Amendment includes *Penguin Books USA, Inc. v. Walsh,* 756 F.Supp. 770 (S.D.N.Y. 1991). In a short discussion applying *McGehee* and *Marchetti,* that court held that the Office of Independent Counsel's (OIC) review procedures and substantive classification determinations for a former employee's book on the Iran–Contra prosecutions violated the First Amendment. *Id.* at 787–88. In particular, that court objected to the lack of clarity in the OIC's responses to plaintiff, the delay in those responses, and the fact that much of the deleted information was in the public domain. *Id.*

1148; *Alfred A. Knopf,* 509 F.2d at 1370; *Marchetti,* 466 F.2d at 1317.

Thus, plaintiff's interest in ensuring that the government's classification decisions have been properly made is grounded in his First Amendment right to publish unclassified material. Plaintiff sued in this Court to enforce his First Amendment rights because after months of negotiations, he and defendants continue to dispute defendants' classification decisions. By denying plaintiff the ability to consult with counsel in challenging those decisions, defendants have implicated his First Amendment interest in a pre-publication process aimed at ensuring that only properly classified material is censored. Once again, this Court should reject defendants' assertions that plaintiff's ability to challenge defendants' actions here is somehow unaffected by his inability to consult with counsel. As discussed above, the right to consult with counsel is intertwined with the right of meaningful access to the courts. Counsel play an invaluable role in assessing, researching, and presenting the legal arguments available to parties based on the facts presented by a case. To conclude that clients could as effectively conduct these proceedings without the assistance of counsel ignores the foundations of our legal system, and the precedent that addresses the constitutional right to retain and consult with an attorney. To suggest that a client is not diminished in his capacity to challenge a government action or decision when his counsel is privy to *none* of the relevant facts is shortsighted.

Undoubtedly there have been *pro se* litigants who have effectively prosecuted and defended lawsuits. However, the fact that some litigants may choose to exercise their right to proceed *pro se* does not undermine the assistance that able counsel provide and the harm inflicted when the government directs a plaintiff to proceed without that assistance.[18] The fact that the government may not be constitutionally required to provide counsel to parties engaged in civil litigation does not alter the constitutional violation that may occur when the government denies individuals the ability to consult with private counsel of their own choosing.

Furthermore, language in *McGehee,* while less than clear, can be read to express support for the inclusion of attorneys in the process of challenging classification determinations in federal court. While discussing the standards and procedures for judicial review of agency classification determinations demanded by the First Amendment, the D.C. Circuit contrasted the review demanded by the First Amendment with that imposed by statutory rights, such as FOIA:

> "Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification .... We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm .... Moreover, unlike FOIA cases, in cases such as this both parties know the nature of the information in question. Courts should therefore strive to benefit from the 'criticism and illumination by [the] party with the actual interest in forcing disclosure.'" *Vaughn v. Rosen,* 484 F.2d 820, 825 (D.C.Cir.1973) ... This was, in fact, the

---

18. The role played by counsel in challenging classification decisions will be discussed further below with respect to whether the government has proven that denying access to Mr. Zaid is the least restrictive means necessary to further the government's interest. Whether counsel is constitutionally necessary remains to be seen. This section simply addresses whether a denial of counsel implicates First Amendment interests.

procedure employed by the district court here.

718 F.2d at 1149. The parties and amicus in this case dispute at length the meaning of this passage. The government argues correctly that the attorney access issue was not before the *McGehee* Court because the government voluntarily allowed Mr. McGehee's attorney access to the material at issue, and therefore the passage at issue can not be "taken as a ruling" on this issue. Defs.' Opp'n of 11/16/01 at 34–35. Plaintiff and amicus argue, on the other hand, that the D.C. Circuit's reference to "criticism and illumination" was intended to include the participation of counsel. 718 F.2d at 1149.

It is true that the *McGehee* Court did not expressly indicate whether the First Amendment required that the above-referenced beneficial criticism and illumination include the participation of counsel as well as the plaintiff. However, two aspects of the passage at issue make clear that the *McGehee* Court was referring to an adversarial process that included plaintiff's counsel. First, the D.C. Circuit cited with approval of "the procedure employed by the district court here." *Id.* That procedure involved *in camera* submissions available to counsel for both plaintiff and the government, as the government did not object to allowing plaintiff's counsel access in that case. Second, the *McGehee* court quoted *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), for the idea of the benefit to the court from the criticism and illumination by the party with the pro-disclosure interest. *Id. Vaughn* clearly contemplated

the inclusion of counsel in this process of "illumination." In discussing the failures of FOIA lawsuits, the court in *Vaughn* contrasted the FOIA process with "the traditional adversary nature of our legal system's form of dispute resolution. Ordinarily the facts relevant to a dispute are more or less equally available to adverse parties." 484 F.2d at 824. Because of the imbalance in access to information, the courts suffer from a lack of "criticism and illumination." Id. at 825. This problem is exacerbated at the appellate level, where the court "is completely without the controverting illumination" by which the "scope of the inquiry" is usually "focused by the adverse parties." *Id.* The Court then contrasted the existing problematic process with its proposed solution a process by which issues would be more adequately illuminated. In such a process, "opposing *counsel* should consult with a view toward eliminating from consideration those portions that are not controverted" and thereby the scope of the court's inquiry would be "narrowed" and "focused." *Id.* at 827 (emphasis added). In no way does *Vaughn* suggest that the plaintiff rather than plaintiff's counsel would conduct this process of illumination.[19]

This discussion of *McGehee* in no way compels the conclusion that the First Amendment requires access be granted to plaintiff's counsel; that conclusion awaits the proper application of the First Amendment balancing test discussed below. However, what *McGehee* and the other pre-publication review cases demonstrate

---

19. It is true that *Vaughn* does not require the disclosure of any information held by the government in order for a plaintiff to challenge the FOIA classification decisions. *Vaughn* clearly does not stand for the proposition that plaintiff's counsel must have access to the information at issue in a *FOIA case.* However, as *McGehee* makes clear, the differences between the interests at stake in the FOIA process and the pre-publication review process are significant. 718 F.2d at 1149. The discussion of *Vaughn* here is simply used to demonstrate that, in citing *Vaughn* for the idea that adversarial criticism and illumination are beneficial to the court, the *McGehee* Court contemplated the inclusion of counsel for both parties in that process.

is that the process by which defendants have conducted the pre-publication review of plaintiff's manuscript, a process that included here denying plaintiff the ability to consult his counsel with respect to the portions of the manuscript at issue, implicates plaintiff's First Amendment rights and is subject to this Court's careful review.[20]

## B. The Proper Balancing Test to Be Applied

■ After careful review of the small number of pre-publication review cases and First Amendment doctrine, the D.C. Circuit in *McGehee* articulated the test that this Court must apply to restrictions on the speech of former government employees in the pre-publication review context. 718 F.2d at 1142. First, "restrictions on the speech of government employees must 'protect a substantial government interest unrelated to the suppression of free speech.'" *Id.* (*quoting Snepp,* 444 U.S. at 509 n. 3, 100 S.Ct. 763). Second, "the restriction must be narrowly drawn to 'restrict speech no more than is necessary to protect the substantial government interest.'" *Id.* at 1143 (*quoting Brown v. Glines,* 444 U.S. 348, 355, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980)). Furthermore, when the government's actions have re-

stricted protected speech, the government bears the burden of demonstrating the constitutionality of its actions. *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161, (1999) ("[T]he Government bears the burden of identifying a substantial interest and justifying the challenged restriction"); *Reno v. American Civil Liberties Union,* 521 U.S. 844, 859, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Edenfield v. Fane,* 507 U.S. 761, 770–771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993); *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Defendants here have restricted plaintiff's speech, and implicated the two First Amendment interests described above, by prohibiting him from revealing to his attorney the information contained in the allegedly classified portions of his manuscript. The test articulated in *McGehee* applies to plaintiff's challenge to this restriction on his speech in the context of the pre-publication review process.[21] Therefore, it is

---

20. Defendants rely on a recent decision by this Court in *M.K. v. Tenet,* 99 F.Supp.2d 12 (D.D.C.2000) which denied a proposed class of plaintiffs' First Amendment challenge to the CIA's refusal to grant plaintiff's counsel access to information known to plaintiffs. This case differs significantly from *M.K.* in that plaintiff has challenged the result of a pre-publication review, and therefore more than one First Amendment interest has been infringed by defendants' actions. Furthermore, the *M.K.* decision reflects an analysis only of the First Amendment right of access to courts, not the right to speak to counsel. Finally, the limited discussion and conclusion of the *M.K.* Court was in part based on plaintiffs' failure to clearly articulate their theory of a

First Amendment violation they had alleged. In contrast, plaintiff here has clearly alleged two speech interests at stake, and has extensively briefed the issue. For all these reasons, this Court is not bound by any conclusions made in that case.

21. Neither plaintiff nor amicus have alleged that the government's action here constitutes a content-based restriction on speech. However, the Court notes that insofar as defendants contend that they are preventing plaintiff from revealing the information based on the sensitive nature of the information itself, this restriction is at least arguably based on the content of the speech that has been prohibited, and therefore should be subject to the

only by examining the interests served by the government's action, and whether the action of denying plaintiff the right to communicate this information to his counsel is sufficiently tailored to serve those interests, that this Court can properly balance the interests at stake in this case.

Defendants do not attempt to apply the *McGehee* test.[22] Instead, defendants consistently cite cases in which the government invoked the state secrets privilege for the blanket proposition that national security interests *necessarily* outweigh any constitutional interests asserted by a plaintiff in litigation. *See, e.g.,* Defs.' Mem. of 3/8/02 at 17 (*citing Halkin v. Helms* (*Halkin II*), 690 F.2d 977, 1001 (D.C.Cir.1982) and *Halkin v. Helms* (*Halkin I*), 598 F.2d 1, 7 (D.C.Cir.1978), at 19) (*citing Ellsberg v. Mitchell,* 709 F.2d 51, 61 (D.C.Cir.1983)); Defs.' Opp'n of 11/16/02 at 31 (*citing Halkin II,* 690 F.2d at 1001). These cases do not address the two questions posed by *McGehee.* The test for determining the constitutionality of the government's action in a case in which the state secrets privilege has been invoked is significantly different from the test to be applied in cases in which the government has not invoked that privilege, and defendants are not entitled to the insulating benefit of that exceptional privilege without going through the process mandated by the courts for invoking it. *Compare Halkin II,* 690 F.2d at 991 ("Therefore, the critical feature of the inquiry in evaluating the claim of privilege is not a balancing of ultimate interests at stake in the litigation. That balance has already been struck. Rather, the determination is whether the showing of the harm that might reasonably be seen to flow from disclosure is adequate in a given case to trigger the absolute right to withhold the information sought in that case.") *with McGehee,* 718 F.2d at 1142 ("We must, then apply a balancing test in determining whether the CIA's censorship of ex-agents' writings violates the first amendment.").

This Court can not overstate the fact that the government has *not* asserted the state secrets privilege here, and it is unclear at this point whether it would or could. In *United States v. Reynolds,* the Supreme Court described the extraordinary measure of the state secrets privilege and mandated that the government go through specific procedures in order to effectively insulate its actions from the usual standards of judicial review. 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953). With respect to the privilege, that Court stated: "[i]t is not to be lightly invoked. There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Id.* at 7–8, 73 S.Ct. 528. Furthermore, the assertion of state secrets privilege must be subject to judicial review. *Id.* As the D.C. Circuit has explained:

The head of an executive department can appraise the public interest of secre-

---

most strict scrutiny by this Court. *See Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). However, because none of the parties nor amicus have addressed this issue, and because the governments' actions here fail the test articulated by *McGehee,* this Court need not reach the issue of whether this restriction is content-based. *Id.* ("Deciding whether a particular regulation is content based or content neutral is not always a simple task.").

**22.** When asked at oral argument to identify where in their briefs defendants apply this test, defense counsel objected that they had applied the test, but then did not identify the pages of the brief that contained that argument. Upon close review of defendants' briefs, this Court can not find any portion that specifically applies the two prongs of the *McGehee* test.

cy as well (or perhaps in some cases better) than the judge, but his official habit and leaning tend to sway him toward a minimizing of the interest of the individual. Under the normal administrative routine the question will come to him with recommendations from cautious subordinates against disclosure and in the press of business the chief is likely to approve the recommendation about such a seemingly minor matter without much independent consideration. Sensitive to these concerns, the Supreme Court has declared that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." Thus, to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation.

*Ellsberg,* 709 F.2d at 58 (*quoting Reynolds,* 345 U.S. at 10, 73 S.Ct. 528).

Four principles guide judicial review of a state secrets privilege claim. First, the government must demonstrate to the judge a "reasonable danger" that injury to the national interest will result from the disclosure at issue.[23] *See Reynolds,* 345 U.S. at 10, 73 S.Ct. 528; *Ellsberg,* 709 F.2d at 58; *Halkin I,* 598 F.2d at 9. Second, "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds,* 345 U.S. at 11, 73 S.Ct. 528. Third, "the more plausible and substantial the government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim." *Ellsberg,* 709 F.2d at 59. Fourth, "the more compelling a litigant's showing of need for the information in question, the deeper 'the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate.'" *Id.* at 58–59 (*quoting Reynolds,* 345 U.S. at 11, 73 S.Ct. 528).

It would be inappropriate for this Court to anticipate or pre-judge a state secrets claim that could be asserted with respect to any of the information at issue in this case. However, it is equally inappropriate for the government to attempt to adopt the result of cases in which the state secrets privilege has been invoked in order to trump plaintiff's constitutional claim here. Defendants' argument that national security interests, once asserted by the government, necessarily trump individual constitutional rights relies on state secrets privilege cases that are inapplicable to this case.[24] Were defendants to actually invoke the state secrets privilege here, the court would subject that claim to the appropriately strict level of scrutiny. Absent any invocation of the state secrets privilege, however, defendants can not insulate

---

**23.** "The various harms, against which protection is sought by invocation of the privilege, include impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg,* 709 F.2d at 56.

**24.** Furthermore, although the balance of interests between a plaintiff's constitutional or statutory rights and the government's interest in national security is relevant in state secrets cases only to the level of scrutiny to be applied by the court, many of the state secrets cases cited in support of defendants' argument are further distinguishable because plaintiffs assert only statutory claims. These cases do not support to the proposition argued by the government here that the national security interest asserted here always trumps a plaintiff's *constitutional* claim. The balance of a statutory interest, under for example the Freedom of Information Act, against the compelling interest in controlling access to sensitive information, is a very different question than the balance between equally compelling constitutional interests.

their actions under a blanket claim of national security without undergoing the First Amendment balancing required by the Constitution.

Finally, the argument advanced by the government, that national security interests necessarily outweigh the First Amendment, simply does not reflect the law. If this argument were true, the list of First Amendment cases that would have been decided differently is long. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

### 1. Were Plaintiff's First Amendment Interests Infringed for a Substantial Interest Unrelated to the Suppression of Free Expression?

To pass constitutional scrutiny, the government's actions must "protect a substantial interest unrelated to the suppression of free speech." *McGehee,* 718 F.2d at 1142. As discussed above, the government's explanation for its actions here has been less than clear. The declarations explaining the denial of access give two justifications, the sensitive nature of the information, and Mr. Zaid's failure to serve a governmental function.[25] These two justifications serve very different interests. The first arguably serves the compelling interest of protecting national security, and the second serves only the government's interest in discouraging private lawsuits against the government.[26]

█ This is not the first court to deal with such a confusing mass of justifications for government action that has been challenged on constitutional grounds. Two important principles can be discerned from precedent with respect to how a court should consider multiple explanations for government action in determining whether that action was unrelated to the suppression of free expression. First, the court should not consider *post hoc* rationalizations given by defense counsel that find no support in the record. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Spence v. Washington,* 418 U.S. 405, 414 n. 8, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *cf. United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (in context of Fourteenth Amendment heightened scrutiny of governmental gender classification, the government's non-discriminatory "justification must be genuine, not hypothesized or invented post hoc in response to litigation"). The sole governmental interest articulated by defense counsel here—risk of harm to national security—will not be disregarded by this Court because the decisions of Mr. Eatinger and Mr. Aly were at least in part motivated by the sensitive nature of this information.

Second, if the government's action is motivated by two purposes, one of which is related to the suppression of free expression, and one of which is unrelated to the

---

**25.** Furthermore, despite these declarations, defense counsel has consistently characterized the action as wholly motivated by the interest in national security.

**26.** Defendants' admission in the Aly Declaration and at oral argument that the government allows access to attorneys in administrative challenges to pre-publication classifications decisions but denies access to plaintiffs who sue to challenge pre-publications classifications on the basis that attorneys suing the government are merely

asserting private rather than governmental interests suggests that the denial of access may be motivated by a desire to gain advantage in litigation. Denying plaintiff's counsel access to information in order to gain advantage in litigation in which a plaintiff asserts a First Amendment claim, while allowing counsel access to information at the administrative level smacks of retaliation for the assertion of First Amendment rights. Such a justification can not be said to be unrelated to the suppression of free expression.

suppression of free expression, the Court should not strike down an otherwise constitutional action based on the improper purpose. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *United States v. O'Brien*, 391 U.S. 367, 382–83, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). While the record does suggest that the government may have in part been motivated by a desire to gain an advantage in this litigation and therefore intended to discourage plaintiff from exercising his First Amendment rights, the Court need not determine whether or not this was in fact a motivation for the government's action. Even if the government's intent was in part retaliatory, if the decision to deny access was in part motivated by the interest in protecting national security information, then, according to Supreme Court precedent, the latter, proper interest trumps. *See O'Brien*, 391 U.S. at 382, 88 S.Ct. 1673 ("this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive"). Thus, for purposes of the First Amendment analysis, this Court addresses only the government's asserted compelling interest in protecting national security.

■ This Court, however, is faced with a further dilemma. Whether or not the government's action of denying access to the information at issue serves the compelling interest of protecting national security arguably turns on whether the information is properly classified in the first place. The D.C. Circuit has clearly stated that the government has no interest in preventing the disclosure of unclassified materials. *McGehee*, 718 F.2d at 1142. It is equally clear that the government's interest in

controlling access to properly classified information is compelling.[27] *Snepp*, 444 U.S. at 509 n. 3, 100 S.Ct. 763; *McGehee*, 718 F.2d at 1143 (explaining the compelling interest in protecting "Secret" information that by definition has the "potential for causing serious damage to the national security"). If the information at issue here is properly classified, as defendants contend, then their interest in controlling access is compelling. If the information at issue here is improperly classified, as plaintiff contends, then the government has no interest in controlling access.

However, it would defeat the purpose of plaintiff's First Amendment challenge for this Court to independently determine whether the information is properly classified in order to decide the motion to compel access, as the reason plaintiff needs to give his attorney access is to argue that the classification decisions were improper. To hold that the First Amendment issue of whether plaintiff's attorney is entitled to access turns on whether the information at issue was properly classified would put the cart before the horse.

The solution to this dilemma is not apparent. If the Court were to presume that the information was improperly classified, as plaintiffs argue, the Court would always grant a plaintiff's motion to compel because no compelling government interest would be served by the denial of access. At the end of the day however, if the Court's presumption was proven wrong, the real interests at stake in the case would not have properly entered into the First Amendment balancing. With no review of the basis for that presumption, plaintiffs and plaintiffs' counsel could gain access to properly classified information, thus increasing the risk that national secu-

---

**27.** At least with respect to "Top Secret" and "Secret" level classifications, the government's interest is compelling. *McGehee*, 718 F.2d at 1143 (declining to determine whether government's interest in protecting "confidential" information is compelling).

rity would be threatened by inadvertent or intentional disclosure. On the other hand, the Court could instead presume that the information is properly classified for purposes of deciding the First Amendment question.[28] The First Amendment determination would then hinge on the outcome of the narrow tailoring analysis rather than the nature of the interest served. The risk with this option is that at the end of the lawsuit the court could determine that the information was improperly classified, thereby undermining the presumptions on which the First Amendment motion to compel was decided.

Plaintiff and amicus do not dispute the defendants' argument that the interest served by denying access is compelling. They argue that despite this compelling interest the plaintiff's First Amendment interests win the balance. This Court will assume the government's interests here are compelling for purposes of the First Amendment analysis. The Court saves for another day the extremely difficult question of how to structure the First Amendment analysis when whether the government's interests are sufficiently compelling turns on the very issue underlying the case the propriety of the classification determinations. This Court need not delve into the complicated question of whether the information was actually properly classified until it reaches the merits of the case.

In sum, while there were arguably two interests reflected in the decisions to deny Mr. Zaid access to the information at issue, this Court need only consider the interest that is unrelated to the suppression of free expression—the government's interest in controlling access to classified information—in order to protect the national security. Whether or not the denial of access here serves that compelling interest turns on whether the information at issue was properly classified. This Court will assume that the information at issue is properly classified as Secret, and thus avoiding any predetermination of the merits of this lawsuit.

## 2. Did Defendants Restrict Any More Speech Than Necessary to Serve a Substantial Interest?

Assuming *arguendo* that the government's restrictions serve the compelling interest of protecting national security information, the government's actions must still be narrowly drawn to restrict no more speech than is necessary to protect that interest. *McGehee*, 718 F.2d at 1143; *see also Brown v. Glines*, 444 U.S. 348, 355, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). As discussed above, the burden is on defendants to show that their actions were no more restrictive than necessary to protect the interest asserted here. *See, e.g., United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

As discussed above, defendants do not attempt to apply the balancing test articulated in *McGehee* because they rely on their unpersuasive argument that national security necessarily trumps a First Amendment interest. As a result, defendants do not offer much in their briefs that can be construed as an argument about narrow tailoring. Defendants simply assert that national security is impermissibly threatened when one more individual, regardless of who that individual may be, is granted access to properly classified information. Defs.' Mem. of 3/8/02 at 18 ("The courts, however, have consistently recognized that disclosure of classified information to a litigant's attorney-even one with a security clearance and even if a protective order is in place poses an unacceptable

---

28. *See* Defs.' Mem. of 3/8/02 at 21 n. 26 ("The Court must assume, for purposes of plaintiff's motion to compel, that the information at issue is properly classified.").

risk to national security.") To support this argument, defendants offer no specific argument with respect to the harm that may be caused by the inadvertent release of the information at issue here, but only citations to language from cases in which courts have expressed concern about the risk caused by the release of classified information to counsel. *See Ellsberg v. Mitchell,* 709 F.2d 51, 61 (D.C.Cir.1983); *Weberman v. National Security Agency,* 668 F.2d 676, 677–78 (2d Cir.1982); *Colby v. Halperin,* 656 F.2d 70, 72 (4th Cir.1981); *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362 (4th Cir.1975); *Tilden v. Tenet,* 140 F.Supp.2d 623, 626 (E.D.Va.2000).

This Court has no objection to concerns expressed by other courts in other contexts about the probability of harm caused by the disclosure of classified information; however, those concerns are in no way binding or persuasive with respect to the specific First Amendment balancing test at issue here. Both *Colby v. Halperin,* 656 F.2d 70, 72 (4th Cir.1981),[29] and *Weberman v. National Security Agency,* 668 F.2d 676, 677–78 (2d Cir.1982), involved the denial of access to classified information to plaintiff's counsel in the context of FOIA claims. 656 F.2d 70, 668 F.2d 676. As discussed above, the differences in the balance of interests between FOIA and constitutional claims was made clear in *McGehee.* 718 F.2d at 1149. The conclusions of the Fourth and Second Circuits in the context of FOIA claims simply do not apply here. With respect to *Ellsberg v. Mitchell,* 709 F.2d 51, 61 (D.C.Cir.1983), and *Tilden v. Tenet,* 140 F.Supp.2d 623, 626 (E.D.Va.2000), those courts were reviewing assertions of the state secrets privilege. As discussed above, a court's inquiry changes once that privilege is asserted and the resulting analysis does not apply here.

Finally, one case cited by defendant did involve a First Amendment challenge to pre-publication classification decisions. *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362 (4th Cir.1975). In reviewing a District Court's decision with respect to the legality of the CIA's classification determinations in a pre-publication review, the Fourth Circuit did recognize that the disclosure of classified information "carries with it serious risk that highly sensitive information may be compromised." *Id.* at 1369. However, that statement must be put in a context that defendants have neglected to include. The Fourth Circuit in *Alfred A. Knopf* clarified its decision in *Marchetti* with respect to what it thought the proper standard of review of classification decisions should be in federal court. The Fourth Circuit frankly admitted that need for a reconsideration of its earlier decision arose out of "problems" that developed in the district court's trial on the classification issues. *Id.* at 1367. Indeed, the district court in *Alfred A. Knopf* conducted a public trial to determine whether the deleted items in Mr. Marchetti's manuscript were properly classified.[30] *Id.* at 1365. While clarifying what the government did and did not have to release during that trial, the Fourth Circuit made the above statement quoted by defendants in this case. However, the Fourth Circuit's concern about inadvertent release was with *irrelevant* information:

> Nor was it necessary for the government to disclose to lawyers, judges,

---

29. *Colby v. Halperin* is a FOIA case related to the *Marchetti* and *Alfred A. Knopf* cases and the ongoing effort by Mr. Marchetti to gain disclosure of the classified information in his manuscript.

30. The Fourth Circuit's opinion refers to Top Secret material submitted at trial, but does not explain the mechanism by which that material was submitted i.e., on the public record, in a sealed proceeding, *in camera,* or *ex parte in camera.*

court reporters, expert witnesses and others, perhaps, *sensitive but irrelevant information* in a classified document in order to prove that a particular item of information within it had been classified. It is not to slight judges, lawyers or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have. The national interest requires that the government withhold or delete *unrelated* items of sensitive information, as it did, in the absence of compelling necessity.

*Id.* at 1369(emphasis added).[31] It is undisputed that classified information in documents that is irrelevant to plaintiff's challenge to the classification of information in his manuscript should not be submitted to this Court. However, contrary to the government's argument, this passage from *Alfred A. Knopf* in no way compels the conclusion that plaintiff's attorney should not be granted access to *relevant* classified information.

In order to determine whether the government's actions have been sufficiently tailored to its asserted interests, this Court must consider the ways in which giving information to an individual attorney could cause harm to national security. First, the attorney himself could pose a threat to national security by virtue of his own activities, and therefore giving him Secret level information would pose some risk that the attorney himself would take harmful action. Second, the attorney could pose a threat of releasing the infor-

mation either to the general public or to particular members of the public who could use that information against the United States' interests. The only other risk that the release of information to an individual could pose is the residual risk of inadvertent disclosure caused whenever there is a transfer of information. In other words, the information could be of such importance that residual risk of inadvertent release caused by giving access to one more person regardless of who that person is, justifies the denial of access.

Defendants here do not allege that release of information to Mr. Zaid poses either of the first two types of threats to national security. Instead, the only risk of harm to national security that defendants have identified in this case is the residual risk of inadvertent disclosure that occurs when one more person is granted access to information that has been classified at the Secret level. Defendants, however, have been inconsistent in protecting this interest. It is undisputed that plaintiff's attorneys in other litigation have been given access not only to the allegedly classified portions of manuscripts but also to the government's declarations and evidence used to support those classifications. *See McGehee*, 718 F.2d 1137; *Alfred A. Knopf*, 509 F.2d 1362; *Marchetti*, 466 F.2d 1309. *McGehee* involved "Secret" level information and *Alfred A. Knopf* at least in part involved "Top Secret" information. 718 F.2d at 1140; 509 F.2d at 1366. The government cannot claim that the residual risk of inadvertent disclosure was any different in those cases; nor can the government argue that the resulting impact on national security would be any less.

---

**31.** The Fourth Circuit's concern with inadequate security in chambers is not applicable to this Court: "In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have." 509 F.2d at 1369. This Court often handles sensitive classified information in both civil and criminal cases, and follows the appropriate procedures and safeguards mandated by law for maintaining the secrecy of such sensitive information.

Defendants do attempt to distinguish the sensitivity of the information at issue here: "In the instant case, the sensitivity of the information at issue is such that the government has concluded that access to that information should be strictly limited to those who absolutely need to know it in order to perform or assist in a governmental function, a circumstance they found lacking here." *See* Defs.' Mem. of 3/8/02 at 20. However, it is undisputed that the information in plaintiff's manuscript has been classified only as Secret and not Top Secret or higher. The government cannot plausibly classify information at the Secret level, and then argue that the inadvertent disclosure of that information poses a *greater* risk to national security than would the disclosure of information classified as Top Secret.

Furthermore, in addition to the access granted to Secret and Top Secret information in prior federal lawsuits, defendants themselves admit that they grant access to classified information to attorneys, including plaintiff's attorney, who challenge pre-publication classification decisions through the administrative process. *See* Eatinger Decl. at ¶¶ 10–11. The government has given no justification for any differential concern about the risk of inadvertent disclosure in these two types of proceedings that would justify granting access in one and not the other-indeed any attempted justification would appear to be arbitrary. Defendants defend this practice only by arguing that it falls within the Executive's discretion. *See* Defs.' Mem. of 3/8/02 at 20.

Even if the information at issue in this case is so sensitive that disclosure to one more person poses an unacceptable risk of harm to national security, something that defendants have not proven,[32] defendants would be hard-pressed to justify why their counsel in this case has been granted access to this information while plaintiff's counsel has not. As amicus has pointed out:

> One can only wonder on what basis defendants have decided that their own counsel have a "need to know" the disputed material. Apparently, defendants believe that a person arguing that certain material has been *properly* classified has a need to know the material, while a person arguing that the same material has been *improperly* classified has no need to know it.

Amicus Mem. of 3/22/02, at 3 n. 2 (emphasis in original). While government counsel do pledge their loyalty to the United States and the Constitution, it is not the risk of intentional disclosure with which defendants here purport to be concerned, but the risk of inadvertent disclosure. If disclosure to one more person truly carries an unacceptable risk of inadvertent disclosure, government counsel's access here has no more justification than would plaintiff's counsel's.

Thus, the government has been less than consistent in enforcing its concern about the residual risk of inadvertent disclosure of classified information. The government's concerns for the risk of inadvertent disclosure are further undermined by the strict protective order that will be imposed by this Court. The government has not argued that it denied access because of a reasonable concern that plain-

---

**32.** Indeed, defense counsel was unable at oral argument to inform the Court how many people have had access to this information already. Defendants' argument that granting access to one more person is unacceptable is undermined by their inability to tell the Court how many people have seen it already. Ac- cording to amicus, over two million people in the United States are cleared for access to Secret level information. *See* Amicus Mem. of 3/22/02 at 6 n. 5 (*quoting* Report on the Commission of Protecting and Reducing Government Secrecy, S. Doc. 105–2, 103rd Cong. (1997)).

tiff's attorney would not comply with the protective order.

If defendants are truly concerned with residual risk to national security caused by turning over this information in litigation pursuant to a protective order, the proper mechanism to prevent that disclosure is the state secrets privilege. The government has neither invoked the state secrets privilege, nor offered the Court information as to why the standard of harm reflected in the state secrets doctrine would be met here. If this Court were to conclude that the government's generalizations about the residual risk caused by the sensitive nature of the information are sufficient to trump two very fundamental First Amendment interests, it would effectively allow the government to have the benefit of the extraordinary measure of the state secrets privilege without meeting the constitutional requirements for the assertion of that privilege.

Finally, defendants argue that this Court should not conclude that the First Amendment requires access for plaintiff's counsel because that conclusion would render the *in camera ex parte* proceedings in FOIA and State Secret cases unconstitutional. As explained above, the balance of interests at stake in FOIA and State Secrets cases are different than the interests at stake here. Because FOIA cases involve attempts by plaintiffs to gain access to information that they do not already possess, the First Amendment interest in speaking freely with counsel is not implicated. The only interest asserted against the constitutionally-based interest in controlling access to national security information is statutory. As discussed above, the test for evaluating the constitutionality of the government's action is different in cases in which the state secrets privilege has been invoked than in cases in which it has not.

For all these reasons, the broad generalizations offered by defendants about the residual risk of inadvertent disclosure are insufficient to satisfy the exacting requirements of the First Amendment. The government has failed to meet its burden of showing with requisite specificity why disclosure of information to plaintiff's counsel pursuant to a protective order is no more restrictive than necessary to prevent the asserted harm to national security. Defendants' decision to deny plaintiff's counsel access to this information therefore violates the First Amendment.

## III. Plaintiff's Request for Access to the Government's Classified Pleadings to be Submitted in Support of the Classification Determinations.

In addition to moving this Court to compel access for his attorney to the allegedly classified portions of plaintiff's manuscript, plaintiff has also moved the Court to compel access to the government's classified pleading that will be submitted in support of the government's argument on the merits of the classification determinations. Application of the First Amendment balancing test to determine whether or not plaintiff's counsel must be granted access to the government's classified arguments and declarations with respect to the merits of the classification determinations is premature. In particular, attempting to make such a determination without knowing what level of classification the government has assigned to that information would be inappropriate. Having said that, this Court believes the government will be hard-pressed to justify the denial of access to plaintiff's counsel to any Secret-level information submitted in support of their arguments. However, this Court will not pre-judge this fact-intensive inquiry. Plaintiff's request for access to this information will be denied without prejudice to

the plaintiff's renewed motion at the appropriate time.

## IV. Defendant's Request for Stay to Consider Invoking State Secrets Privilege

In a footnote at the end of a recent brief in opposition to plaintiff's motion to compel, defendants ask this Court, in the event that this Court decides to grant plaintiff's motion, to stay all proceedings in this case for 60 days while they decide whether or not to invoke the state secrets privilege. Defs.' Mem. of 3/8/02 at 27 n. 33. Defendants provide absolutely no authority or justification for why this plaintiff's First Amendment claims, which are entitled to expedited consideration by this Court, should be so delayed while defendants consider their options. Defendants have violated plaintiff's First Amendment rights by denying his counsel access to the information in plaintiff's manuscript. If state secrets privilege were a proper defense to this motion to compel, defendants had *more* than ample opportunity to raise that defense during the several rounds of briefing ordered by this Court since plaintiff's motion to compel was filed in October of 2001. The government has delayed the resolution of the legality of their classification decisions for long enough. Defendants' request is denied.

## V. Remedy

Because this case involves First Amendment rights of the utmost importance, and has been delayed considerably while this Court accorded the difficult and novel questions raised by plaintiff's motion to compel the attention they deserved, the resolution of plaintiff's challenge to defendants' classification will now proceed with a swift pace. Therefore, this Court will order the government to begin conducting the requisite background check on Mr. Zaid immediately. This Court will also require that the government report back with a final determination on Mr. Zaid's trustworthiness in no more than two weeks. The government should keep in mind that the First Amendment demands a timely resolution of the classification determinations, and any delay in approving or disapproving Mr. Zaid's background check will be considered with the utmost scrutiny by this Court.

If the government determines that Mr. Zaid has met the requirements for access to Secret-level information, it shall provide access to the entirety of plaintiff's manuscript according to appropriate procedures. Finally, while the government conducts the background check on Mr. Zaid, the parties shall agree upon and file with the Court an appropriate proposed protective order.

## CONCLUSION

The government has asked this Court to take the extraordinary step of insulating its actions from judicial review and from constitutional challenge. For the foregoing reasons, this Court refuses to take that step. This Court will not allow the government to cloak its violations of plaintiff's First Amendment rights in a blanket of national security. Once again, the words of one member of the fractured coalition of the Supreme Court in *United States v. Washington Post Co.*, resonate here:

> The responsibility must be where the power is. If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully. It is an awesome responsibility, requiring judgment and wisdom of a high order. I should suppose that moral, political, and practical considerations would dictate that a very first principle of that wisdom would be an insistence upon

avoiding secrecy for its own sake. For when everything is classified, then nothing is classified, and the system becomes one to be disregarded by the cynical or the careless, and to be manipulated by those intent on self-protection or self-promotion. I should suppose, in short, that the hallmark of a truly effective internal security system would be the maximum possible disclosure, recognizing that secrecy can best be preserved only when credibility is truly maintained.

403 U.S. at 729, 91 S.Ct. 2140 (Stevens, J., concurring). In conclusion, the vision of separation of powers and national security advocated by the Executive Branch in this case fails to account for the critical importance of the freedom of speech in our constitutional order: "Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion filed this same day, it is hereby

**ORDERED** that plaintiff's motion to compel access is **GRANTED IN PART AND DENIED IN PART**; it is

**FURTHER ORDERED** that plaintiff's motion to compel is **GRANTED** with respect to the allegedly classified portions of plaintiff's manuscript; it is

**FURTHER ORDERED** that plaintiff's motion to compel is **DENIED WITHOUT PREJUDICE** with respect to any classified pleadings to be filed by defendants in support of their classification determinations; it is

**FURTHER ORDERED** that defendants' request for a stay of this case for 60 days is **DENIED**; it is

**FURTHER ORDERED** that defendants shall begin conducting the appropriate background clearance process to determine whether Mr. Zaid fulfills the government's requirements for access to classified information; it is

**FURTHER ORDERED** that defendants shall make a final determination with respect to Mr. Zaid's access by no later than **June 21, 2002**; it is

**FURTHER ORDERED** that if the government determines that Mr. Zaid has met the requisite standards for access to this information, Mr. Zaid shall be granted access as soon as practicable; it is

**FURTHER ORDERED** that the parties shall confer and file with the Court an appropriate proposed protective order and non-disclosure agreement with respect to the information in plaintiff's manuscript as soon as possible but in any event by no later than **June 20, 2002 at noon**; it is

**FURTHER ORDERED** that a status hearing shall be held in this case on **June 21, 2002 at 9:45 a.m. in Courtroom One.**

**IT IS SO ORDERED.**